Argued January 8; reversed April 15; costs retaxed April 29, 1947

# MENEFEE *v.* BLITZ
### (179 P. (2d) 550)

*Arthur A. Goldsmith,* of Portland (with Sol Siegel, of Portland, on brief), for appellant.

*David Sandeberg,* of Portland (with Sheppard & Phillips, of Portland, on brief), for respondent.

Before ROSSMAN, Chief Justice, and LUSK, KELLY, BAILEY and HAY, Justices.

## ROSSMAN, C. J.

This is an appeal by the defendant from a judgment in the sum of $5,000, based upon findings of fact and conclusions of law, which the circuit court entered in favor of the plaintiff. The complaint which instituted the action alleged that the plaintiff was induced

by fraudulent representations made by one A. I. Blitz to pay $5,000 on July 1, 1937, for 20,000 shares of the capital stock of Bell Oil and Gas Company which was then engaged in drilling an exploratory oil well. March 20, 1940, Mr. Blitz died. The defendant is his widow and the executrix of his estate. Actions which arose out of circumstances somewhat similar to those now before us are *Sheppard v. Blitz,* 177 Or. 501, 163 P. (2d) 519, and *Sheppard v. Blitz,* 168 Or. 691, 126 P. (2d) 509.

The appellant presents five assignments of error. The first challenges rulings made by the trial judge which permitted Mr. Chester Sheppard, a witness for the respondent, to relate representations concerning the aforementioned oil well which he swore Mr. Blitz made to him. The second attacks rulings which permitted Mr. L. B. Menefee, Sr., father of the respondent, to repeat representations which he claimed Mr. Blitz made to him about the well. The third is based upon a finding entered by the circuit court which follows:

"The plaintiff, in reliance upon the false representations made to him by the said A. I. Blitz, has been damaged in the full sum of $5,000.00."

The fourth says:

"The lower court erred in making its finding of fact No. VI to the effect that in reliance upon the representations found by the trial court to have been made to the Respondent by A. I. Blitz, Respondent paid to said A. I. Blitz the sum of $5,000, for the evidence shows that there was no reliance on four of these six representations."

The fifth assignment of error challenges the following finding:

"At the time of making the said representations they were false and untrue and A. I. Blitz knew

that the said representations were false and untrue, or he made them with reckless disregard as to their truth, and they were made without any present intent to perform any one of them.''

The complaint attributes twelve false representations to Mr. Blitz. Those which are material to this appeal are:

(1) ''He discovered a commercial oil sand at the depth of 700 feet in the well he was drilling on said Bates property, and that said oil sand was capable of producing from 100 to 150 barrels of oil per day.''

(2) ''He personally owned all the machinery and equipment that he was using in drilling said well, and that said machinery and equipment was capable of drilling the well to a depth of 8,000 feet.''

(3) ''In drilling said well on said Bates property he had discovered five oil sands, all capable of producing oil, and that at said time he was in another oil sand at a depth of 4,225 feet.''

(4) ''If plaintiff and one Chester A. Sheppard would furnish him $10,000.00, he would drill said well on said Bates property to a depth of 6,500 feet, and that, if said $10,000.00 was not sufficient for this purpose, he would personally pay the expense of drilling the well to that depth.''

(5) ''If commercial production was not obtained before reaching or at the depth of 6,500 feet, he would, at his own expense, take all necessary steps to bring in oil wells in the commercial sand which he represented he had discovered at a depth of 700 feet; that is, that he would drill wells to the 700-foot level where he stated he had discovered a commercial oil sand capable of producing 100 to 150 barrels of oil per day.''

(6) ''He had invested personally in the well on said Bates property the sum of $79,000.00.''

(7) ''He had a competent, capable and experienced driller in charge of drilling said well * * * .''

(8) "If the plaintiff and Chester A. Sheppard would furnish $10,000.00, that amount would be sufficient to complete the well under the conditions then and there existing."

The complaint avers that those representations were untrue.

The answer admits that

(1) Plaintiff on July 1, 1937, paid Mr. Blitz $5,000 in payment of 20,000 shares of stock of Bell Oil and Gas Company.

(2) Mr. Blitz "stated to plaintiff that an oil sand had been discovered at a depth of 700 feet in the well that was being drilled."

(3) Mr. Blitz "did not own all the machinery and equipment that was being used in drilling said well, and that the same was not new."

(4) "Said Chester A. Sheppard and the plaintiff did pay to said A. I. Blitz the sum of $12,500.00."

(5) "On or about the 13th day of September, 1937, drilling was discontinued."

Upon the trial the appellant conceded that "on September 13, 1937, drilling ceased and the well did not go deeper than between 4,700 and 4,800 feet." The answer alleges:

"Defendant does not have sufficient knowledge or information on which to form a belief as to whether or not said machinery was capable of drilling the well to 8,000 feet * * * or as to the number of oil sands capable of producing oil that had been discovered, or as to whether the money paid by plaintiff was used by said A. I. Blitz for drilling purposes exclusively, or as to the amount invested by A. I. Blitz personally in said Bates well, or whether A. I. Blitz personally invested the full sum of $79,000 in said Bates well * * * and, therefore, denies said allegations."

We mention the following facts developed by unchallenged testimony.

In the early part of 1935 Dr. L. G. Johnson, a geologist, made a geological survey of a four-square-mile area in Kern County, California, which was a part of the Devils Den area. His purpose was to determine whether the sector contained oil. This case is concerned with an exploratory oil well which was drilled in a part of that area known as the Bates property. That well is the one which we have already mentioned. The complaint says:

"During the year 1936 said A. I. Blitz commenced the drilling of an oil well on an eighty-acre section of property known and hereinafter referred to as the Bates property; said Bates property is more particularly described as follows: The west one-half (W. ½) of Section 20, Township 25 South, Range 9, * * * ."

It was Dr. Johnson who chose the Bates property as the site for the well.

Dr. Johnson's competency to make the survey received commendation from one E. D. Ulrich, a witness called by the respondent, who had had twenty years' experience in the oil business. Mr. Ulrich backed his faith in Dr. Johnson by becoming financially interested in the well. No one criticized Dr. Johnson's ability as a geologist, unless the following testimony given by Mr. Ulrich can be deemed criticism:

"I had no reason to doubt him until after he missed his objective around 3,000 feet. * * * Every oil man that has any experience loses confidence in any geologist, no matter who he is, when he doesn't get the sand where he says it is. * * * He got one sand, but he missed one, he didn't get the Vaqueros sand, is the one I wanted, he didn't get it."

At the conclusion of Dr. Johnson's survey he wrote a comprehensive report which described the geology, topography and stratigraphy of the area. It delineated the indications of petroleum which Dr. Johnson encountered and gave the history of drillings for oil which had been made in the area. The report mentioned the amount of oil produced by each well that was drilled. We observe that a paragraph, headed Geology and Indications of Petroleum, says in part:

> "The several shallow wells drilled in the west half of Section 29-25-19, encountered fairly saturated live oil at an average depth of 630 feet. Formation is claimed to be Etchegoin."

A paragraph, entitled Jacalitos—Upper Miocine, says:

> "In Section 29-25-19, several shallow wells have been drilled to an average depth of 630 feet, and an oil zone of variable thickness has been encountered. From the description of drill samples and the assertion of drillers, it is claimed to be Etchegoin. * * * Production in Etchegoin in the area would be singular phenomenon, as the Etchegoin in this region is non-petroliferous. Jacalitos, on the other hand, does produce in the west field of Coalinga District. It is safe to assume, therefore, that the formation penetrated in these shallow wells—Section 29—should be Jacalitos."

A part of the report, entitled History and Development of Devils Den Area, says that drilling began in the area in 1900. These paragraphs portray the results achieved by about 100 wells which were drilled within or near the area with which Dr. Johnson's report was concerned. Referring to Section 25, Township 25, Range 18, it says:

> "Up to 1920, in this southern portion of Township 25, fifty-six wells were drilled, ranging in depth from 200 to 4100 feet. Oil was found in every one

of them, varying in amount of production and also in gravity. * * * The producing horizon was in the Vaqueros.''

Shortly the report mentions wells which were drilled in Section 19, Township 25, Range 19, and states:

"A well was drilled in the N. W. ¼ of Section 29-25-19, by the Elk Hills Coalinga Company in 1928, known as Totem No. 2 (Sec. N. W.–S. E. cross section). This well encountered Jacalitos production zone at 588 feet, and brown shale at 1100 feet. There were several good showings in brown shale down to 1718 feet, at which depth it was suspended for lack of money. The Hogden Realty Company in 1925 drilled two wells in the same quarter—one to 600 feet and the other to 630 feet. In both wells, Jacalitos zone was productive. About 15 feet of producing sand was found, producing 15 barrels of 42 degrees gravity oil per day.

"A well was also drilled during this time in the center of Section 30 in the N. W. ¼. According to information, the hole reached a depth of 930 feet, where brown shale (Monterey-Temblor) was encountered. The well was abandoned for some reason or other. * * *

"From then on, development became dormant. In January, 1924, Devils Den Area was producing close to 8,000 barrels of oil per month from approximately 30 wells."

Next, the report gives accounts of four wells which were drilled in 1930, 1934 and 1935. Seemingly each was a productive well, but since they were in sections contiguous to Range 18, we shall mention them no further. This part of the report says:

"Summing up these data, one outstanding feature should be noted, which is, that all of the formations penetrated in the various wells from Jacalitos to Critacious, were proven productive.

"Therefore, if the new exploratory well should be drilled in the area of favorable structure, and away from the seeps and surface exposures of producing horizons, excellent results should be derived from such exploration."

The report comes to a close thus:

"Conclusions:

"First: The geographical situation of this sector is desirable, being in 'Oil Country' and is practically surrounded by producing fields.

\* \* \*

"Third: Geological formations, as found in this area, unquestionably contain oil. Whether they will prove economically productive, only a deep test well will prove or disprove.

"Fourth: Structural conditions are such as to postulate considerable accumulation of oil at a reasonable depth with very large drainage area.

\* \* \*

"Seventh: This sector is sufficiently proven with shallow wells \* \* \* and these wells have also proven that all of the productive zones are saturated, and under favorable conditions, will undoubtedly produce sufficient oil to warrant extensive exploration of this leasehold.

\* \* \*

"Ninth: Summing up all known facts, this sector is worthy of intelligent exploration and, in all probability, will prove from an economic standpoint, very remunerative."

So far as the record indicates, Dr. Johnson was prompted by no ulterior motive when he made his survey. He was called as a witness by the respondent and was asked no questions which even intimated that his survey was influenced by improper considerations.

Some time after Dr. Johnson wrote his report a copy of it came into the possession of one J. L. Keck, who was an official of a small oil company which bore the name of Den Petroleum Company. Mr. Keck called the report to the attention of the aforementioned E. D. Ulrich, who evidently became convinced that an exploratory well should be drilled. Mr. Ulrich, besides being acquainted with Mr. Keck and Mr. Blitz, had a friend by the name of General R. L. Peeler, who was a former president of a large oil company. Mr. Ulrich went with the report to General Peeler. The next that we hear concerning Dr. Johnson's report is that General Peeler, Mr. Keck and Mr. Ulrich brought it to Mr. Blitz, whose home was in Portland but who at that time was in Los Angeles. Shortly those three men made Mr. Blitz acquainted with Dr. Johnson. Although the evidence upon the subject is scant, it seems that Mr. Blitz returned to Portland after the four men had spoken to him without arriving at any conclusion upon their overtures. After he had returned to Portland he received from Mr. Ulrich a telegram which stated:

"Checked Johnson with Ed McAdams, Tom O'Donnell, Allen Jergens, geologist for Jergens Trust. All agreed he was competent man and reliable. He located McAdams' well in Delray and it was one of the best in field. He worked at Mountainview for Jergens in 1927 and it is one of the best fields in the state."

Mr. Blitz, upon receipt of the telegram, decided to drill a well in the area covered by Dr. Johnson's report. Before proceeding, he acquired leases upon 1,240 acres of the land which Dr. Johnson thought contained oil, including the 80-acre Bates property. Dr. Johnson selected as the site for the well the Bates

tract. Although the evidence in regard to this detail is vague, it seems that General Peeler, Mr. Keck and Mr. Ulrich joined Mr. Blitz in the venture. Mr. Blitz, however, at the outset provided all of the capital. He remained in Portland except for occasional visits to the well. The work of drilling the well was entrusted at the beginning to the Den Petroleum Company which we have already mentioned. Mr. Ulrich visited the well not less than once a week. In the trial court respondent's counsel said that Mr. Ulrich "was on the ground all the time and had an interest in the thing." He sent Mr. Blitz letters and telegrams which gave accounts of what was going on. After the Den Petroleum Company reached a depth of 1,280 feet, Mr. Ulrich, according to his testimony, "surveyed the well and he (Keck) was out 147 feet in one direction and 27 feet off in another." While the Den Petroleum Company was making its irregular bore, Mr. Ulrich complained to Mr. Blitz. After their imperfect work was discovered and corrected, the Den Petroleum Company "went off the job," so Mr. Ulrich testified, and "Mr. McWhorter came on." Shortly the drilling operations were entrusted to Dr. Johnson, who continued in charge until September, 1937, when, due to lack of funds, operations ceased.

At the beginning of operations Mr. Blitz supplied all of the money. Later, when the outlay had become sizeable, money was obtained from others. The investors were protected by a declaration of trust signed by Mr. Blitz in which he acknowledged that he held title to the property for the benefit of all who supplied capital. Later, Mr. Ulrich became an associate trustee. In June of 1937 some of the group who were financing the operations suggested that a corporation should be organized. The evidence indicates that Mr. Blitz

by that time had contributed about $70,000 toward the venture, and other members of the group about $35,000. The well was then down to a depth of about 4,200 feet. At that point the Bell Oil and Gas Company was organized. Up to then the respondent had acquired no interest in the venture; in fact, he had not heard of it.

We come now to the first and second assignments of error which, we believe, can conveniently be considered together.

Mr. Sheppard, whom we mentioned in our statement of the first assignment of error, is an attorney, of Portland, who has successfully participated in the oil business in California. He and Mr. Ulrich were friends; in fact, it appears that they had been in business ventures together. Mr. Sheppard's firm represents the respondent in this action. Mr. Blitz was acquainted with Mr. Sheppard and had sought to interest him in the well. A visit between the two men was terminated in the following manner, according to Mr. Sheppard:

"I listened to him. I told him I wasn't interested; that I had all the oil wells that I wanted and that I wasn't going to gamble in oil; that when he had an oil well, that I might talk to him."

In July of 1937 Mr. Blitz returned to Mr. Sheppard. The latter was acquainted with Mr. L. B. Menefee, Sr., who is a man of large affairs. When Mr. Blitz again sought to interest Mr. Sheppard in the well, Mr. Sheppard suggested that Mr. Menefee, Sr., might like to hear about the venture. We now return to Mr. Sheppard's testimony:

"I called Mr. Menefee. Mr. Blitz wanted $10,-000,—L. B. Menefee, Sr.; I hardly knew L. B. Menefee, Jr.; I knew him but I had never been in

business with him and I had with L. B. Menefee, Sr., and I respected his judgment. Mr. Blitz said he wanted $10,000 to complete this well. I didn't want to put up $10,000. * * * and before I called Mr. Menefee, Mr. Blitz told me his story about the well on the Bates property and what the situation was."

Shortly Mr. Menefee, Sr., arrived and then, according to Mr. Sheppard, "Mr. Blitz repeated his story to Mr. Menefee, Sr." When Mr. Sheppard was asked to recount the story there came the objections which underlie the first assignment of error. They were overruled. In quoting Mr. Sheppard's testimony, we shall omit the recurring objections and the rulings which were made while he proceeded. The testimony he gave consisted of his repetition of the representations he claimed Mr. Blitz made to him. The representations were made, according to Mr. Sheppard, for the purpose of inducing him to buy stock of the Bell Oil and Gas Company. He testified:

"Mr. Blitz stated that he had drilled a well on the Bates property; that he was down now 4,200 feet, 4,200 or 4,300 feet—that he had passed through five oil sands; that he had encountered commercial production at 700 feet, and I asked him what he meant by commercial production and he said, 'That sand will produce from 100 to 150 barrels of oil per day.' He said he was now in another oil sand and he wanted to go to 6,500 feet because of recommendations made by his geologist, Johnson; there was another oil sand there, and that he needed $10,000 to do this. He said, of course, that he expected to get a gusher there. I said, 'Well, if you don't,'—I asked Mr. Blitz what he was going to do if this money was not enough to go to 6,500 feet. He said he would personally put up the money. He said he had personally put in this well $79,000 and he needed help, and I told him—Mr. Menefee also

told him—that we were not going to gamble, and if he had commercial production as he said he had at the 700-foot level, I would be willing to put up $5,000. I asked him who owned the equipment and he said that he owned it. I asked him if it was new equipment; he said it was. He said it was capable of going to 8,000 feet, drilling to 8,000 feet, and he said that if—that was in response to a question of mine—that if he didn't get production at 6,500 feet, what he would do. He said, 'I'll come back and drill a number of wells at the 700-foot sand, and there is no chance of you losing your money.' I said, 'If that is so, I'll put up $5,000.' Mr. Menefee said that he wouldn't, at his age, put up any money in an oil well, but his son, L. B., Jr., might be interested; he would communicate the information to him. I at that time signed a purported pre-organization agreement that there was a number of names on, I think about fifteen. That pre-organization agreement was between Blitz and others. I signed for $5,000. I think my name was the last signature on it. And Mr. Blitz agreed that he would pay all the debts, transfer his property free and clear to the corporation.

"Q. Are you relating what was provided there in the pre-organization agreement, Mr. Sheppard?

"A. That is right; perhaps I shouldn't say that; but anyway I put up the $5,000, the equivalent."

The fact that all of the above was intended for Mr. Sheppard and Mr. Menfee, Sr., only, and not for others, is well illustrated by the following statement which Mr. Sheppard volunteered after he had given the foregoing testimony:

"I would like to say, if I may here, if the Court please, that Blitz's object in talking to me was to get ten thousand dollars. I wouldn't put up ten. So on this occasion Mr. Blitz was trying to get ten thousand out of both of us. In other words, he made these representations to Mr. Menefee and to

me for the purpose of getting ten thousand out of us.''

The respondent was not present when any of the above representations were made, and does not contend that Mr. Sheppard transmitted to him anything which Mr. Blitz said upon the above occasion; in fact, the respondent's brief says:

> ''It is true that the record shows that Sheppard did not personally, by words from his own mouth, communicate these representations to the respondent.''

The respondent himself testified:

> ''Q. Before making this investment of $5,000 for the stock, did you talk to Mr. Sheppard about putting your money in?
> ''A. No.
> ''Q. He didn't tell you anything about that either?
> ''A. I didn't talk to him about it.''

The first assignment of error challenges the ruling which permitted Mr. Sheppard to give the above testimony. The objections made by the appellant were that representations which are not transmitted to the purported victim are inadmissible. In addition, there were other objections, but they are not included within the first assignment of error.

The second assignment of error is based upon rulings which permitted Mr. L. B. Menefee, Sr., to testify:

> ''Mr. Blitz wanted to raise $10,000 to finish a well that he was boring for oil in California and he stated that—we talked it over, the three of us; Mr. Sheppard was there at the time—and he had already—I think he was down to 4,500 or 4,300 feet, something like that—and he wanted to finish his well and he needed $10,000 more. He had already put up $77,000 or $79,000, my recollection of his

own money, besides others that had gone into the project, and he struck oil at the depth of 700 feet; he could bring in oil at 700 feet, 150 barrels a day, which would pay us a nice profit on what we put in, on what the capital stock was.

\* \* \*

"Well, he was asked about the equipment and he said he owned the equipment, and we asked him whether it was first class, capable of going down deeper, and he said it was.

"Q. How far down did he tell you he was going?
"A. Well, he was going 6,500 feet.

\* \* \*

"Q. Did he say anything about what he was going to do after he had gone down that far?
"A. Oh, yes; we questioned him about that and he said that in case that he didn't strike a gusher, as he termed it, at that depth, that he would drop back and put down several wells 700 feet deep. \* \* \* Well, we asked him if he didn't strike oil at 6,500 feet what he was going to do then. Well, he said he would probably go to 8,000 and he would put up the money himself."

The respondent was not present when Mr. Blitz made the above purported statements. The father's testimony indicates that Mr. Blitz's purpose was to induce him—not someone else—to purchase stock in the venture.

The testimony of Mr. Menefee, Sr., was received over objections which urged that representations which are not made to the purported victim, and which were not transmitted to him, are inadmissible. The following is the only testimony given by the father which indicates whether or not he relayed the representations to his son: "After that meeting I told my son about it." He did not disclose what he told his son. The words

just quoted are everything he said upon the subject. The son, that is, the respondent, testified:

"One day during the summer of 1937 my father told me he had heard of a proposition that Mr. —— of an oil well put up by Mr. Blitz. He wanted to know if I would be interested in it.

"Q. Thereafter—did your father at that time tell you anything that Mr. Blitz had told him?

"A. Well, just in a general way."

At that point the subject was dropped and the respondent did not reveal what, if anything, his father told him. Upon cross-examination the respondent was asked concerning testimony which he gave four years previously upon a trial of a phase of this case. He was then asked and answered as follows:

"Q. Did you know about the meeting that your father had had in Chester Sheppard's office?

"A. No, I honestly did not; I won't say that for sure or not, I don't remember whether Dad came back and repeated this, talked about the matter he had had up in Sheppard's office or not; I really don't remember."

Thus, the only evidence which discloses whether or not the father told his son what Mr. Blitz said is the father's statement, "I told my son about it" and the son's statement that his father told him "just in a general way", modified possibly by his version of the same incident as given upon the previous trial.

After Mr. Blitz's conference with Mr. Sheppard and Mr. Menefee, Sr., he called upon the respondent, who was an officer of several corporations, including the West Coast Logging Company, L. B. Menefee Lumber Company, the Burlingame Company, and Highlands, Inc. The respondent swore that in the course of the visit to his office Mr. Blitz said that 1) the well was

down "some 4,000 feet"; 2) the drilling "had absolutely followed out the predictions made by some geologists"; 3) "they had found oil, as I remember, at the 700-foot level; there wasn't a great deal there, but it was what he termed a commercial well"; 4) they were going down still further in the hopes of bringing in "a much bigger well"; 5) Blitz had invested "something short of $80,000 in this venture"; 6) Blitz "was getting a little short of cash"; 7) "if I would put up this money he would go ahead and complete it,—I don't know whether it was complete it or go down to 6,500 feet"; 8) if "this larger quantity of oil was not found at that level, they would go back to the 700-foot level * * * and bring in this commercial well"; 9) "I don't remember whether it was he as an individual or he as a trustee owned all of the equipment"; and 10) "it was equipment capable of drilling an oil well."

By comparing the testimony of the foregoing three witnesses, it will be observed that there are material differences. Mr. Sheppard, for instance, swore that Mr. Blitz told him "he had passed through five oil sands. * * * *He said he was now in another oil sand." Neither the respondent nor his father claimed that anything of that kind was said to them. Our purpose now is not to ascertain the truth, but to determine the admissibility of the challenged testimony. Mr. Sheppard and Mr. Menefee, Sr., swore that Mr. Blitz told them that he expected to strike "a gusher" at the 6,500-foot level. The respondent, in relating the purported representations, did not use that term. Mr. Sheppard and Mr. Menefee, Sr., testified that Mr. Blitz told them that he owned the drilling equipment, that it was new and capable of drilling to a depth of 8,000 feet. The respondent testified that "I don't remember whether it was he as an individual or he as a trustee

owned all of the equipment," and that Mr. Blitz went no further than to describe the equipment as "capable of drilling an oil well." The difference in the testimony of the three men which is particularly stressed by the appellant pertains to the alleged representations concerning the 700-foot level. Mr. Sheppard swore that Mr. Blitz told him that he "encountered commercial production at 700 feet," and that, in response to a question, he explained that commercial production meant 100 to 150 barrels daily. According to Mr. Menefee, Sr., Mr. Blitz said that he "could bring in oil at 700 feet, 150 barrels a day, which would pay us a nice profit." The respondent swore that Mr. Blitz told him "they had found oil, as I remember, at the 700-foot level; there wasn't a great deal there, but it was what he termed a commercial well." Mr. Sheppard testified that Mr. Blitz told him that if he failed to find oil at the 6,500-foot level "I will come back and drill a number of wells at the 700-foot sand, and there is no chance of you losing your money." Mr. Menefee, Sr., swore that Mr. Blitz said that if he did not "strike a gusher * * * he would probably go to 8,000" or "he would drop back and put down several wells 700 feet deep." The respondent, on the other hand, testified that Mr. Blitz represented that if "this larger quantity of oil wasn't found at that level, they would go back to the 700-foot level * * * and bring in this commercial well."

In his efforts to sustain the rulings challenged by these two assignments of error, the respondent submits the following propositions: 1) "Great latitude is permitted in the introduction of evidence in causes involving fraud." 2) "Evidence of similar frauds committed by a person charged with fraud are admissible against him to prove motive, intent or scienter."

3) "False representations similar to those made to plaintiff, made to third persons either before or after the representations to plaintiff, are admissible as part of the res gestae." 4) "The findings of a trial court will stand, regardless of whether or not error was committed in the admission of testimony if there is sufficient evidence to support them." In addition, it is claimed that the representations which Mr. Blitz made to Mr. Sheppard and to Mr. Menefee, Sr., were transmitted to the respondent. We have given all of the evidence which controls that contention.

Although the respondent invokes the above propositions of law to support the attacked ruling, we observe from the transcript of evidence that only one of those which we preceded with a numeral was mentioned during the trial by the respondent when the objections were pending for a ruling, and its mention was scant. When the respondent asked Mr. Menefee, Sr., to repeat what Mr. Blitz told him, appellant objected that representations made to the father were inadmissible unless they came to the ears of the respondent. Then the following occurred:

"Mr. Phillips: That is correct, your Honor, but it is a part of the whole transaction.

"The Court: Do you propose to connect it up?

"Mr. Phillips: Yes, your Honor."

Mr. Phillips, in making that observation, seemingly had in mind what is now denominated his third proposition, the res gestae feature. At that point the appellant amplified his objections, but met with the ruling:

"Mr. Menefee, Sr., is called out of order and I am going to hear the testimony and I will give it such consideration as it is entitled to subsequently, but at the present time I will overrule the objection."

It was that ruling which permitted Mr. Menefee, Sr., to narrate the representations which he claimed were made to him.

Let us now see whether any of the above propositions, taken from the respondent's brief, were voiced when Mr. Sheppard's testimony was received. When he was asked to relate what Mr. Blitz told him, the appellant objected that

> "Representations made to one party are not admissible in the proof of a subsequent or a different fraudulent or alleged fraudulent transaction except as it might relate to the question of intent."

Thus, we see that the word "intent" was mentioned, but its mention was not by the respondent, but by the appellant. After the appellant's counsel employed the word "intent" the respondent did not claim that he was endeavoring to prove intent, motive or scienter. The trial judge, immediately after the above objection was made, declared:

> "Same ruling as in connection with a like objection when Mr. Menefee, Sr., was on the stand. Unless it is connected up, the ruling will be corrected."

It is apparent from that statement that the trial judge expected the respondent to present testimony showing that the statements made to Mr. Sheppard were relayed to the respondent. Having been met with that ruling, the appellant inquired:

> "Is it the contention of counsel that this testimony—that Mr. Sheppard discussed this matter before Mr. Junior made the purchase?"

We now quote further:

> "Mr. Phillips: With whom?
> "Mr. Goldsmith: With Mr. Menefee, Jr.
> "Mr. Phillips: No, it is not."

Evidently believing that that answer demonstrated that the hypothesis upon which the ruling was based was in error, appellant's counsel declared: "I urge the objection." At that point Mr. Sheppard, he being the witness whose testimony was under consideration, volunteered the statement: "What I am going to say now has nothing to do with the merits of this case; it is just a history of it." After some colloquy, the court ruled: "You may proceed." Shortly Mr. Sheppard began to relate statements which he attributed to Mr. Blitz and which he claimed induced him (Mr. Sheppard) to invest money in the well. While he was proceeding, appellant repeatedly objected on the ground that representations made to Mr. Sheppard were inadmissible. The ruling was:

"The theory of the evidence, as I assume it to be, is that subsequently these matters were related by Mr. Menefee, Sr., to his son."

During Mr. Sheppard's narration of the representations, the appellant again urged his objections, and thereupon the trial judge, referring to the rulings which he made when Mr. Menefee, Sr., was upon the witness stand, said:

"If the original ruling is correct, this absolutely would be competent."

We reveiwed the situation at the above length for the purpose of showing that the testimony of Messrs. Sheppard and Menefee, Sr., was not presented for the purpose of proving motive, intent or scienter; nor was it introduced for any other limited or restricted purpose. It is manifest that the trial judge received the challenged testimony under a belief that other evidence would show that the statements made to the representees were relayed to the respondent.

After the conditional rulings were made, the trial court did not reconsider them but shortly proceeded with a disposition of the case as though the record showed that the representees relayed to the respondent the statements which they attributed to Mr. Blitz. It is clear that the trial judge did not confine his consideration of the testimony given by the two witnesses just mentioned to the proof of intent, motive or scienter. These statements are warranted by the contents of a memorandum opinion which the trial judge wrote. Before going on, we mention the fact that the trial was conducted in a manner which the memorandum opinion justly termed "most unsatisfactory." We shall not pause to describe the cumbersome method of presenting some of the evidence which rendered the use of the phrase just quoted appropriate. It cast an undue burden upon the court, and possibly caused the fact to be overlooked that no final ruling had been made concerning the admissibility of the testimony given by Messrs. Sheppard and Menefee, Sr. The memorandum opinion shows that the trial judge assumed that other evidence proved that Mr. Sheppard and the father transmitted to the respondent the statements which they swore Mr. Blitz made. We now quote from the memorandum opinion:

"Mr. Menefee believed entirely upon what Mr. Blitz told him and upon what was relayed to him by his father and Mr. Sheppard, to whom Blitz had made similar representations. * * * The attempt to confine the reliance of plaintiff upon certain excerpts from his testimony to the effect that he relied solely upon what Blitz told him, and thereby to read out of the case the testimony of Menefee, Sr., and Sheppard to the effect that Blitz had made representations to them which they relayed to plaintiff, is unavailing. Other portions of plaintiff's testimony indicate he relied upon the

entire situation and information which he obtained from Blitz personally, from Menefee, Sr., and Sheppard, who derived their information from Blitz, who intended them to pass it on to plaintiff. Plaintiff's testimony to the effect that he relied solely upon what Blitz told him and could not remember what Menefee, Sr., and Sheppard had told him, must be considered in the light of all the evidence in the case, and the court is not inclined to give such a literal and restrictive interpretation to plaintiff's testimony as defendant contends should be given. What he said and what he intended to say was that he relied upon what Blitz said, and Blitz, it must be remembered, made like representations to Menefee, Sr., and Sheppard, who communicated them to plaintiff, as well as to the plaintiff.''

The above excerpts render it clear that the trial judge believed that both Mr. Sheppard and Mr. Menefee, Sr., repeated to the respondent what Mr. Blitz had told them. It is likewise apparent from the memorandum opinion that the lower court did not confine the testimony of Mr. Sheppard and Mr. Menefee, Sr., to the proof of intent, motive or scienter. In fact, the memorandum opinion says nothing concerning those subjects. The testimony of Mr. Sheppard and of the father was accepted as corroborative of the respondent's testimony; in fact, the respondent's brief declares that the testimony of these two men should be employed for corroborative purposes, for it says:

''The evidence of Sheppard and Menefee, Sr., corroborate and amplify the evidence given by the respondent.''

■ We shall now consider the admissibility of the foregoing testimony. We start with the rule which is thus stated in *Henry v. Dennis,* 95 Me. 24, 49 Atl. 58:

''It is a general rule that a person cannot complain of false representations, for the purpose of

maintaining an action of deceit, unless the representations were either made directly to him, with the intention that they should be acted upon by him, or made to another person with the intention that they should be communicated to him and acted upon by him."

The same rule is thus stated in 23 Am. Jur., Fraud and Deceit, p. 954, § 150:

"Broadly speaking, a representation must be made to the complaining party in order for him to have a right to rely thereon. A person making a representation is only accountable for its truth or honesty to the very person or persons whom he seeks to influence; no one else has a right to rely on the representation and to allege its falsity as a wrong to him. It seems to be settled law that if a false statement is made to one person to induce him to act, the balance of the world has no legal right to rely on it."

See to the same effect, 37 C. J. S., Fraud, p. 284, § 36.

The appellant does not contend that the respondent had no right to rely upon what Mr. Blitz said to Messrs. Sheppard and Menefee, Sr., in his conference with those men, provided his statements to them were transmitted to the respondent. He claims that the statements were not transmitted.

We do not believe the record shows that the representations which Messrs. Sheppard and Menefee, Sr., swore were made to them were transmitted to the respondent. It is clear that Mr. Sheppard did not speak to the respondent and did not relay to him any information he received from Mr. Blitz. The respondent's testimony that his father told him "just in a general way" what Mr. Blitz said to him does not disclose what, if any, information the father imparted to his son. The representations which the father claims

were made to him are materially different from the representations which the son claims he received from Mr. Blitz. When the respondent swore that his father told him "in a general way" what Mr. Blitz said to the father, it may be that his father told him nothing at variance with the pleading filed in this case by the appellant. When the admissibility of an item of evidence is dependent upon the submission of preliminary proof in the form of "a foundation" or, to use a different term, a condition precedent, the party who offers the dependent testimony must submit the preliminary proof or establish the condition precedent before the dependent fact can be deemed admissible. See Wigmore on Evidence, 3d ed., § 654, and 32 C. J. S., Evidence, § 838, p. 768. The reception of dependent evidence in face of the fact that the preliminary proof was never submitted constitutes error: 5 C. J. S., Appeal and Error, § 1725, p. 990. We are satisfied that the respondent's phrase "just in a general way" failed to establish a basis for the admission of the extensive testimony given by his father and Mr. Sheppard. Even a reading of the cold transcript of testimony shows that Mr. Sheppard's testimony possessed force and cogency. When the trial judge availed himself of the testimony of Mr. Sheppard and Mr. Menefee, Sr., under a belief that the preliminary proof had been received, he was in error.

■ By reverting to the contentions advanced by the respondent in support of the ruling under which the challenged testimony was received, it will be seen that he argues that great latitude is permissible in the introduction of evidence in causes involving fraud. This court has taken note of that rule of trial practice: *Columbia River Door Company v. Priest,* 128 Or. 359, 274 P. 116, and *Boord v. Kaylor,* 114 Or. 62, 234 P. 263.

That rule, however, does not authorize the receipt of evidence which violates the law of evidence: Wigmore on Evidence, 3d ed., § 344; 37 C. J. S., Fraud, § 804, p. 410; and 24 Am. Jur., Fraud and Deceit, § 266, p. 101. This rule of practice, upon which the respondent relies, did not warrant the receipt of the challenged testimony.

■ It is next contended that evidence of similar frauds is admissible to prove "motive, intent or scienter." The rule governing that contention is stated in Wigmore on Evidence, 3d ed., § 341; 37 C. J. S., Fraud, § 113, p. 424; and 24 Am. Jur., Fraud and Deceit, § 270, p. 109. The latter authority says, in part:

"An important limitation upon the admissibility of similar frauds is that they are competent only on the issue of motive or intention, and, hence, are not admissible in an action for fraud in which the right to relief does not depend upon establishing scienter, motive or intent."

The challenged evidence does not prove or disprove that Mr. Blitz knew that the representations which it is claimed he made were false. Hence, the testimony of Mr. Sheppard and Mr. Menefee, Sr., showed nothing concerning scienter. Intent and motive were not in issue upon the trial. We have shown by quotation from the answer that the appellant admitted that Mr. Blitz sold to the respondent 20,000 shares of stock for $5,000 and that in so doing he told the respondent that "an oil sand had been discovered at a depth of 700 feet in the well which was being drilled." Thus, it was conceded that Mr. Blitz's statements to the respondent were made with the intention of inducing him to buy stock. It was freely admitted at the trial that after the drilling operations started Mr. Blitz talked to several men for the purpose of persuading

them to join him in the venture, and that some of them contributed capital. Mr. Ulrich persuaded his brother-in-law to join the venture, and, referring to Mr. Sheppard, testified: "I was trying to get Blitz to get him in for his advice and counsel, I wasn't particular about getting any money out of him." According to one of the exhibits, Mr. Blitz said before his death:

"My whole talk with everybody was that I didn't want any widows or orphans in. If they couldn't afford to gamble, I advised them not to come in."

Thus there was no issue at the trial concerning intent or motive. The issue was whether or not the statements which Mr. Blitz made to the respondent were true or false. Furthermore, as we have shown, the challenged testimony was not offered at the trial for the purpose of proving motive, intent or scienter, but was submitted upon the hypothesis that the respondent would later show that the representees relayed to the respondent the statements they attributed to Mr. Blitz. We do not believe that the contention advanced by the respondent sustains the challenged ruling.

■ The contention that the representations which it is said Mr. Blitz made to Mr. Sheppard and Mr. Menefee, Sr., were a "part of the res gestae" and were, therefore, admissible to prove that he made similar representations to the respondent, is not sustained by the authorities upon which the respondent relies: *Hoff v. Peninsula Drainage District No. 2,* 172 Or. 630, 143 P. (2d) 471; *Thompson v. Rose,* 16 Conn. 71, 41 Am. Dec. 121; 24 Am. Jur., Fraud and Deceit, § 269. The *res gestae* with which this case is concerned was the sale of 20,000 shares to the respondent for the sum of $5,000. Mr. Blitz's transaction with Mr. Sheppard was not a part of his sale to the respondent, but was

a different res gestae. The transaction with Mr. Sheppard is evidenced by a five-page written agreement bearing the signatures of both Mr. Blitz and Mr. Sheppard. The former is designated therein as party of the second part, and the other as party of the first part. From it we quote:

"This agreement, made and entered into * * *

"WHEREAS, the second party personally, and as trustee, has drilled a well in search of oil on said 80 acres, and has encountered one oil sand at about 700 feet, and now believes that said well is either in or is approaching another oil sand of considerable proportion * * *.

* * *

"WHEREAS, the second party does not claim to have the experience necessary to operate gasoline plants and oil wells, and the second party has such other duties that take approximately all of his time, and

"WHEREAS, the first party has had considerable experience in the building and operation of gasoline plants and the management and operation of oil wells, including the drilling of both gas and oil wells, and the second party desires to secure the services of the first party in the management of the oil wells and drilling of the same on said 80 acres, and also desires that the first party and his associates construct a gasoline absorption plant on or about said property if sufficient gas is obtained to warrant the construction of the same,

"NOW, in order that the corporation Bell Oil & Gas Company may have sufficient funds with which to complete the said oil well, the first party has paid to the second party the sum of Five Thousand Dollars ($5,000.00) in cash, the receipt whereof is hereby acknowledged by the second party. The second party agrees that all of said sum of money shall be devoted to the completion of said oil well. The second party further agrees that he

will issue, or cause to be issued, 20,000 shares of the capital stock of the Bell Oil & Gas Company to the first party, all at the rate of twenty-five cents (25¢) per share, and all fully paid and non-assessable.

"The second party further agrees that he will sell, assign and transfer to the party of the first part two (2) percents in the trust property owned and held by him, said trust percents to be delivered free and clear of any encumbrance, and subject only to the trust agreement heretofore created. In full payment for said two (2) percents, the first party agrees to sell and transfer to the second party four thousand (4,000) shares of common stock of the Euphrates Mining Company, Limited (Non-Personal Liability).

"It is further agreed that the second party will help, aid and assist the first party in the completion of the organization of the said corporation, Bell Oil & Gas Company, and that he will give, so far as he is able, the contract for the extraction of gasoline from the gas produced from any and all wells on said acreage to the party of the first part, or to whomsoever party of the first part may direct, on such terms and conditions as the parties hereto and their associates may agree, and that, if a gasoline plant is constructed, either by the first party or his associates or assignees, on the property of the Bell Oil & Gas Company, the second party will help, aid and assist the owners of said gasoline plant to secure a contract or contracts for all the gas produced from the surrounding acreage, whether held in trust by the second party *of* by other firms, persons or corporations.

"The second party further agrees that as soon as said well is completed, the organization of the Bell Oil & Gas Company will be completed, and the first party and his nominees shall be elected to the board of directors to operate the said company, and, if the first party so elects, he shall be elected president, with full power to manage, operate and control the drilling and operation of all

oil and gas produced on the 80 acres owned by the Bell Oil & Gas Company, subject, however, to the direction of the board of directors of the said corporation.

 \* \* \*

"This contract being of a personal nature, it is agreed that both parties will cooperate to the fullest extent in the development of the property \* \* \*."

We are satisfied that Mr. Blitz's transaction with Mr. Sheppard was no part of the res gestae with which this case is concerned.

Without setting forth further analysis, we express our conclusion that the testimony given by Mr. Sheppard and by Mr. Menefee, Sr., was inadmissible.

■ The respondent argues that the findings of a trial court will not be disturbed on appeal, even though testimony was erroneously received, if other evidence, properly received, supports the findings. This court has held that in actions tried without a jury it will presume, in the absence of indications to the contrary, that the trial judge, in reaching his findings, disregarded incompetent evidence which he erroneously admitted, and that he based his findings upon the properly admitted evidence: *Wakefield, Fries & Co. v. Sherman Clay & Co.,* 141 Or. 270, 17 P. (2d) 319; *Bannon v. Thompson,* 136 Or. 311, 298 P. 907; *Klinge v. Farris,* 128 Or. 142, 268 P. 748; 273 P. 945; *Brownell v. Heitman,* 125 Or. 515, 266 P. 1067; *Bryant v. Dukehart,* 106 Or. 359, 210 P. 454. Other jurisdictions employ the same general rule: 5 C. J. S., Appeal and Error, § 1728, p. 997, and 3 Am. Jur., Appeal and Error, § 940, p. 504. The authority just cited, in addition to stating the general rule, adds:

"This presumption, however, loses its force when it reasonably appears from an inspection of

the record that the incompetent testimony did influence in some degree the action of the trial court in rendering the particular judgment.''

The section of C. J. S. just cited declares:

''In trial by court, the nature of evidence admitted and the influence or effect thereof on the court trying the case or on the complaining party are factors to be considered in determining whether the admission of evidence in particular instances is to be deemed harmless and not ground for reversal on appeal. * * * Moreover, the improper admission of evidence in a trial by court is deemed to be harmless, unless the admission of the evidence in question may have affected the result, or where there is nothing to show that the court considered the evidence complained of in reaching its decision. * * * On the other hand, the admission of incompetent evidence which influences the court in arriving at its decision may be regarded as prejudicial error requiring reversal. * * * At all events, it is, ordinarily, only where it appears that the court was influenced by the improper evidence, or that the evidence admitted was essential to the findings, or that appellant was harmed by the error, or where the appellate court was influenced by the evidence erroneously admitted, that the judgment of a trial court hearing a case without a jury will be reversed for the admission of evidence.''

■ Any rule other than the one we just quoted from the textbooks would place appellate courts in the plight of being compelled to affirm a judgment notwithstanding the fact that it was entered as the result of the trial court's commission of prejudicial error. In the case at bar it is impossible to presume that the erroneously admitted testimony was not considered when the findings were entered. It affirmatively appears that it was considered, and that it influenced the trial

court when the attacked judgment was rendered. We conclude that the first two assignments of error must be sustained.

 Although the disposition made of the first two assignments of error demands a reversal of the circuit court's judgment, we shall go on and set forth our views in regard to the third assignment of error, which contends that the evidence fails to show that the respondent was entitled to a judgment in the sum of $5,000, that being the entire amount which he paid for his stock. So that we shall not be accused of having overlooked something, we add that shortly after the respondent paid $5,000 for the 20,000 shares he entered into an agreement with Mr. Blitz whereby he loaned to the latter a bond in the denomination of $5,000 so as to enable Mr. Blitz to procure more funds with which to carry on the drilling operations. The bond was subsequently returned and that transaction is of no materiality to this case. Normally, the measure of damages in a case such as this is the difference between the sum paid for the stock and its value at the time of purchase: *Howard v. Merrick*, 145 Or. 573, 27 P. (2d) 891, and *Van de Wiele v. Garbade*, 60 Or. 585, 120 P. 752. If the stock purchased was valueless at the time of its purchase, the amount of the judgment should be the full sum which was paid for it: *Van de Wiele v. Garbade,* supra. The plaintiff, in an action such as this, has the burden of proving the amount of his damages. If he fails to prove that the stock was utterly worthless, his damages will, of course, be something less than the sum which he paid for it. We observe from the record that after the respondent had completed the introduction of virtually all of his evidence and was under cross-examination, his attorney declared: "There has been no proof of that, as to the

value of this stock, your Honor, and no indication as to the value.'' That statement was an admission that the evidence did not show the value of the stock with which this case is concerned, and that the plaintiff had not discharged the burden of proof. Until the respondent discharged the burden of proof which rested upon him to prove that the stock was worth less than the sum which he paid for it, he was not entitled to a judgment.

■ The evidence indicates, in our opinion, that the stock possessed value on the day of its purchase. We shall now recite the facts upon which we base that statement. The stock under consideration was issued by a corporation which was seeking to extract hidden treasure, in the form of oil, from the bowels of the earth. It might develop that there was no oil in the stratum for which the drill was headed, but the things which man hopes he will find in the unknown often lend to a project more value than the things which he actually possesses. The corporation in which the respondent bought his stock was following a plan of action which was devised by a competent geologist; the latter was in charge of the drill. At the beginning it was thought that oil in large quantities would be found in the Vaqueros sand and that the latter would be encountered at a depth of about 3,000 feet. It was assumed, however, that it might be necessary to go down much deeper. When the respondent purchased his stock, the drill had not yet reached the Vaqueros sand. When the drilling stopped in September, 1937, hopes of discovering oil had not been abandoned. They were still entertained notwithstanding discouraging developments. The cessation of activties was ''because they ran out of money and the equipment was

no good." Those are the words of the respondent himself.

Let us now take note of the indications of oil which were encountered as the drilling progressed. The first were found at the 700-foot level. By reverting to Dr. Johnson's report, it will be observed that many wells in the sector where this one was drilled found oil at about 700 feet. It will be recalled that the agreement which Mr. Sheppard and Mr. Blitz signed says that the well in question "encountered one oil sand at about 700 feet." Telegrams which Mr. Ulrich sent to Mr. Blitz when the 700-foot level was reached stated that he and General Peeler estimated the flow at 110 barrels daily. It is clear from the evidence that a 700-foot well, producing 100 to 150 barrels, would have value. Mr. Sheppard swore that he would deem a well which produced 100 to 150 barrels daily at the 700-foot level a commercial well.

When the 700-foot level was reached, Mr. Keck, whom we have mentioned, was in charge of operations. August 14, 1937, Mr. Ulrich, in a letter to Mr. Blitz, wrote:

"Louis Z. Johnson brought in a well worked out geological report, correlating all of the surrounding wells and what they had encountered. In line with his report we found sand at 700 feet, which would have been productive had Mr. Keck followed out the instructions of Mr. Hanna of the Associated Oil Company and drilled into the sand with oil. I was overruled in this instance or you would have had an oil field in August a year ago."

The letter from which we just quoted was introduced in evidence by the respondent and he has not sought to be relieved from its contents. As a witness, Mr. Ulrich testified that he was present when the 700-foot level

was reached and, concerning conditions at that point, swore:

"Q. You did have faith in that well, when it was first started, didn't you, Mr. Ulrich?

"A. After I saw the 700-foot sand, I did.

\* \* \*

"Q. You were at the well before or after they struck the 700-foot sand?

"A. I was at the well at the time they struck the 700-foot sand.

"Q. Did you get a showing of oil there?

"A. Yes, we got a showing of oil there, a very good showing of oil.

"Q. Did you try to get Blitz to come back and drill a shallow well there?

"A. That was discussed by Blitz, General Peeler and Mr. Keck, and everyone in the conference at that time.

"Q. Did you believe, at that time, you could have brought in a number of shallow wells and made everybody safe?

"A. I did.

"Q. Did you believe that then?

"A. Yes, I believed that then.

"Q. Did you tell Blitz that?

"A. Yes, I did.

"Q. Did you try to get Blitz to come back after he failed to get oil at 4,300 or 4,700 feet and drill in some shallow wells in the 700-foot sand?

"A. Mr. Johnson took the matter up with him and I discussed it at a much later period with Mr. Blitz as to drilling some shallow wells there around this deep well.

"Q. Did he make any move to drill any shallow wells there?

"A. No, he didn't, there was no money to do it with."

In other words, it was lack of money, and not the absence of oil, which seemingly prevented the hopes from being realized.

From the respondent's testimony, we take the following:

"Q. Do you know whether or not they could have got a paying proposition by drilling one well at the 700-foot level?

"A. No, I don't know that now. I might have been familiar with what he said at that time, but I don't remember now."

The above testimony warrants an inference that if the adventurers had drilled shallow wells and had not decided to penetrate further down for the rich deposits they thought lay there, they would have had "productive" wells. Or if their money had not been completely exhausted in September, 1937, and they had returned to the 700-foot level, it seems that they could have brought in "productive" wells. In the face of the facts just mentioned, which are all taken from testimony given by the respondent's witnesses, it is impossible to say that the respondent's stock was worthless when he bought it.

When the drilling reached a depth of about 1,300 feet Mr. Ulrich wrote the following to Mr. Blitz:

"Went to the well yesterday and Johnson is certainly doing a wonderful job. Louie (Johnson) will probably go down and core around 1300; he can bring an oil well here at any point, as the ditch is full of oil and gas, also the sump."

One of the exhibits is a Test Report issued by the State Department of Natural Resources of California. It is dated July 10, 1937, and was, therefore, issued nine days after the respondent purchased his stock.

The Test Report, which is based upon the department's analysis of a sample taken from the well at the level of 3,593 feet, states that the analysis showed "heavy gas-cut drilling fluid, mud and oil." Other exhibits described oil indications which were encountered at the depths of 1,940 and 4,276 feet. We shall pass them by and turn to a letter which Dr. Johnson wrote to Mr. Blitz August 17, 1937, six weeks after the respondent bought his stock:

> "It has been a hard struggle, but we are close to the end now, and I feel confident that all our worries and trouble will be repaid. General Peeler is here, and is planning to stay until we finish the well. Of course, I would be glad to have you here, but at this state and until the well is ready to be put on production, feel that you can do more up in Portland, unless you have a nice fat bankroll to bring down with you."

When that letter was written the well had reached the depth of 4,310 feet. The record fully supports Mr. Johnson's observation that "it has been a hard struggle." The struggle near the end was made difficult by the lack of sufficient money.

It cannot be assumed that courts are able to judge the significance of evidence of the kind we have been describing without the aid of men familiar with geology and oil wells. Possibly the oil indications of which we have taken note are meaningless, but a litigant, who asks a court to hold worthless an investment which he made in a well of the kind described by this record, ought to present evidence showing that the indications are without significance.

About two months after the respondent made his purchase of stock, drilling operations were terminated.

We again turn to Mr. Ulrich's testimony:

"Q. When the Bell Oil & Gas Company stopped the well September 13, 1937, I understand you to testify that their property was attached. Did they owe a lot of bills?

"A. Yes.

"Q. Do you know how many?

"A. They owed the labor $1,308.00.

"Q. Was that paid by Blitz or by the Bell Oil & Gas Company?

"A. It was not.

"Q. Were there other bills down there?

"A. Three or four thousand of additional bills, maybe more.

"Q. Were those paid, if you know?

"A. They were not paid.

"Q. What happened to the machinery?

"A. The machinery was repossessed by the Atlas Supply Company.

"Q. Now, I think you said something when you were on the witness stand the first time about the property, that under the Bates lease the Bell Oil & Gas Company had a right to retain 10 acres surrounding the place where the well was drilled and that this drilled hole contained $11,000 worth of pipe?

"A. That is correct.

"Q. Now, what was done with that property?

"A. Well, there was a labor lien for $1,308 against the property, and under the terms of the lease the Bell Oil & Gas Company could have quitclaimed all but 10 acres on which the well was and retained the well with the pipe in the hole, but I understand that the representatives of Bates came here and succeeded in getting a quitclaim deed to the pipe and the hole down to 4,720 feet, and made some sort of an arrangement that they were going to take care of these labor claims, none of which has been done.

"Q. Now, are you familiar with the law relating to shutting off water in drilling wells?

"A. I am.

"Q. You heard the statement of counsel here?

"A. I did not.

"Q. Just a minute until I ask the question. Counsel in his opening statement, —

"A. I wasn't in the room.

"Q. Well, all right then. Well, he made this statement here that it was necessary, in order to comply with the law of California to plug that hole and to do certain other things before the Bell Oil & Gas Company could quit on the hole, and in order to comply with the law they gave the quitclaim deed to this 10 acres and the well to the Bates people on the agreement of the Bates people to comply with the law. Is there any such law as that down there?

"A. When this well was abandoned and drilling stopped it had 3,600 feet of 9-inch casing in the hole cemented at the bottom; it also had approximately 700 feet of 13-inch casing in the hole; and every drop of water was shut off and every protection that possibly could be given to a well was there, and with the mud standing in the hole no improvement could have been made by any engineer for the protection of that hole from anything that might exist in that area.

"Q. So there was nothing to be done to that hole and the Bell Oil & Gas Company could have retained that 10 acres?

"A. They could have, and were so advised by me to retain it; but they quitclaimed it.

"Q. You considered that gas well and oil well and the pipe in it worth anything?

"A. I considered it worth, if any company wanted to go in there and do any exploratory work, I considered it worth approximately thirty or forty thousand dollars.

"Q. How much was the pipe worth in the hole?

"A. The 9-inch pipe cost approximately $9,000 and the 13-inch pipe cost approximately $2,000.

"Q. Could you salvage that pipe?

"A. You couldn't salvage the 13-inch, that had to protect the water above the 700-foot sand, but you could have salvaged the major portion of the 9-inch pipe and put a cement plug in the hole that would cost approximately — — well, you would have had a considerable sum of money left for your pipe."

We see from the foregoing that when operations ceased on September 13, 1937, the Bell Oil & Gas Company owned the 10-acre plot where the well was drilled and the expensive pipe. Other evidence indicates that it owned the derrick, some machinery, a considerable quantity of tools and two tanks.

If we ignore the fact that damages in cases of this kind are determined as of the time when the stock was purchased, we find that even on the day when drilling finally ceased the stock must have possessed value.

Reverting to Mr. Ulrich's testimony, we observe that the well itself was worth "approximately thirty or forty thousand dollars." Mr. Ulrich said that the well was "quitclaimed"—seemingly he was mistaken about that. The hope of finding oil in profitable quantities was still entertained November 30, 1937, two and one-half months after Dr. Johnson, discouraged by his employer's lack of sufficient money, quit his employment. When he abandoned the undertaking the well was 1,000 feet short of the goal, and those in charge of the venture were seeking a means of reaching the 6,000-foot level. On November 30, 1937, the stockholders of the Bell Oil & Gas Company held a meeting

in the course of which they adopted a resolution which said:

> "Whereas, R. E. Peeler has prospects for the leasing of this property together with other properties held under lease by A. I. Blitz as Trustee, and the said A. I. Blitz, as Trustee, has given to the said R. E. Peeler an option on all of the property held by him, and it is desired that this corporation join with him in the giving of such option; and
>
> "Whereas, it is considered for the best interests that such an option be given to induce some major company or some responsible private parties to complete the drilling of said well, paying to this corporation a one-sixth royalty, including rentals due the owners;
>
> "Now, therefore, it is hereby resolved that the actions heretofore taken by the said A. I. Blitz, as agent for and on behalf of this corporation, and the expenditures made by him as above mentioned, be, and they are hereby approved and ratified; * * *."

Thus three months after the respondent made his purchase, efforts were still under way to reach the stratum where it was thought oil in large quantities would be found.

In view of the above, it cannot be said that the respondent's stock was worthless when it was purchased. Error was committed when the attacked finding was entered. The third assignment of error is sustained.

■ The fourth assignment of error is based upon a contention advanced by the appellant that the respondent did not rely upon all of the representations which he attributes to Mr. Blitz, but only upon two of them. We have examined the respondent's testimony carefully, but cannot say that the trial judge was mistaken when he took the other view.

The fifth assignment of error contends that the evidence fails to show that Mr. Blitz's representations were untrue. The appellant particularly claims that the record fails to show that Mr. Blitz said anything false concerning (1) the oil which was found at the 700-foot level, and (2) the intention to return to the 700-foot level and bring in a well there if a large quantity of oil was not found at a greater depth. The principles of law governing the representations which were made concerning the 700-foot level, whatever they were, are well established, and the briefs filed by the parties show that they understand those principles. Upon a retrial the case will experience no difficulty upon that score.

The judgment of the circuit court is reversed and the cause is remanded for a retrial in harmony with the foregoing.

KELLY, J., did not participate in this decision.

Cost retaxed April 29, 1947

ON MOTION TO RETAX COSTS

ROSSMAN, C. J.

This cause is before us upon objections made by the respondent to the following two items which are in the appellant's cost bill:

"Premium on Appeal Bond (2 years) ....$20.00
"Postage costs for forwarding abstract
and briefs to Supreme Court ............... 1.49"

The objection to the first item is overruled: § 101-1402, subd. 5, O. C. L. A. The objection to the second item is sustained: § 10-912, O. C. L. A., and Rule 19 of this court.