**PORTLAND GENERAL ELECTRIC COMPANY, an Oregon corporation, Plaintiff,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, a Pennsylvania corporation, Defendant.**

**CITY OF EUGENE, acting By and Through EUGENE WATER AND ELECTRIC BOARD, and Eugene Water and Electric Board, a municipal utility corporation of the State of Oregon, Plaintiffs,**

v.

**WESTINGHOUSE ELECTRIC COMPANY, a Pennsylvania corporation, Defendant.**

**Civ. A. Nos. 93–225, 93–562.**

United States District Court, W.D. Pennsylvania.

June 24, 1993.

John H. Bingler, Jr., Deborah P. Powell, Thorp, Reed & Armstrong, Pittsburgh, PA, David A. Aamodt, Douglas R. Nichols, Portland Gen. Elec., Portland, OR, for Portland Gen. Elec. Co.

J. Laurence Cable, Cable, Huston, Benedict, Haagensen & Ferris, Portland, OR, Campbell Killefer, Shaw, Pittman, Potts & Trowbridge, Washington,. DC, for City of Eugene, Acting By and Through EWEB and Eugene Water and Elec. Bd.

James W. Quinn, Mindy J. Spector, Weil, Gothal & Manges, New York City, Robert L. Kaufman, Westinghouse Elec. Corp., Pittsburgh, PA, K. Patrick Neill, Hershner, Hunter, Moulton, Andrews & Neil, Eugene, OR, Kevin Brode, Westinghouse Elec. Corp., Pittsburgh, PA, for Westinghouse Elec. Corp.

## MEMORANDUM OPINION

BLOCH, District Judge.

The instant cases arise from a contract entered into between plaintiff Portland General Electric Company (PGE) and Westinghouse Electric Corporation (Westinghouse), wherein Westinghouse was to supply a Nuclear Steam Supply System (NSSS) for PGE's Trojan Nuclear Power Plant. PGE has filed a complaint at Civil Action No. 93–225 alleging breach of contract, negligence, negligent misrepresentation, fraud, Racketeer Influenced and Corrupt Organizations Act (RICO), and Oregon RICO claims. Plaintiffs at Civil Action No. 93–562, City of Eugene, acting by and through Eugene Water and Electric Board, and Eugene Water and Electric Board (collectively EWEB) have filed an identical complaint, asserting that they own a 30 percent share in the Trojan Plant pursuant to an agreement with PGE. These two cases have been consolidated.

Defendant Westinghouse has filed motions to dismiss Counts One through Four and Six through Nine of PGE's complaint and all of EWEB's complaint.

## I. Standard

■ In ruling on a motion to dismiss, the applicable standard of review requires the Court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party. Rocks v. Philadelphia, 868 F.2d 644, 654 (3d Cir.1989). The question before the Court is not whether the plaintiffs will ultimately prevail; rather, it is whether the plaintiffs can prove any set of facts in support of their claim that will entitle plaintiffs to relief. Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

## II. Negligence and negligent misrepresentation (Counts Four and Six)

Plaintiffs' negligence and negligent misrepresentation tort claims are based upon allegations that the defendant provided the Trojan Plant with steam generators that were defectively designed, fabricated and installed. Plaintiffs contend that defendant represented that it offered special technical and expert capabilities in the field and that defendant failed to exercise the standard of care and competence reasonably expected of a supplier of steam generators. Further, plaintiffs contend that defendant breached its duty to exercise reasonable care in providing PGE and other Trojan entities with truthful and accurate information concerning the Trojan steam generators.

■ Defendant asserts that the economic loss doctrine precludes these tort claims. Under the economic loss doctrine, "one is ordinarily not liable for negligently causing a stranger's purely economic loss without injuring his person or property." Hale v. Groce, 304 Or. 281, 744 P.2d 1289, 1290 (1987).[1]

■ As a threshold matter, plaintiffs assert that the question of the applicability of the economic loss doctrine precluding the tort claims is irrelevant because the plaintiffs have claimed damages other than economic losses, e.g., being forced to prematurely shut down the entire Trojan Plant. However, these costs are "characteristic financial injuries alleged to result from faulty performance of a business transaction." Securities–Intermountain, Inc. v. Sunset Fuel Co., 289 Or. 243, 611 P.2d 1158, 1163 (1980). There is no allegation of personal injury or injury to tangible property occurring in the course of or in consequence of the alleged faulty steam generators. Plaintiffs' alleged damages are simply economic losses and do not shield the plaintiffs from application of the economic loss doctrine. See Onita Pacific Corp. v. Trustees of Bronson, 315 Or. 149, 843 P.2d 890, 896 n. 6 (1992).

Plaintiffs correctly point out that Oregon law provides an exception to the economic loss doctrine. The Oregon Supreme Court summarized that exception in Georgetown Realty, Inc. v. Home Insurance Co., 313 Or. 97, 831 P.2d 7 (1992).

When the relationship involved is between contracting parties, and the gravamen of

---

1. The parties agree that Oregon law is applicable to the instant cases.

the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, ... the injured party may bring a claim for negligence if the other party is subject to a standard of care independent of the terms of the contract.... In some situations, a party may be able to rely on either a contract theory or a tort theory or both. *Id.* at 12 (*citing Ashmun v. Nichols,* 92 Or. 223, 180 P. 510 (1919)).

The *Georgetown Realty* exception provides that "tort claims aris[e] out of a contract if the defendant assumes a position, relationship or status upon which the law predicates a duty independent of the contract." *Susitna Ltd. v. Pacific First Federal,* 118 Or.App. 126, 846 P.2d 438, 440 (1993). For example, "[t]he law imposes a duty of care in the attorney-client relationship.... If the professional breaches that duty, the client and the intended beneficiary can recover economic losses." *Onita,* 843 P.2d at 896–97. The *Onita* Court found most relevant that "[u]nlike parties who are negotiating at arm's length, the attorney is engaged by the client to use his or her expertise for the benefit and protection of the client's interests." *Id.* at 897. The *Onita* Court listed other examples: "Engineers and architects are among those who may be subject to liability to those who employ ... their services and who suffer losses caused by professional negligence," *id.,* "[a]n agent owes duties of care and loyalty to his or her principal," *id.,* and "[a] primary insurer has a duty to excess insurers and to the insured to exercise reasonable care in attempting to settle third-party claims within policy limits," *id.*

In the above relationships, the professional who owes a duty of care is, at least, in part, acting to further the economic interests of the "client," the person owed the duty of care. In contrast, [is the situation which] involves two adversarial parties negotiating at arm's length to further their own economic interest.

*Onita,* 843 P.2d at 897.

■ In such an "adversarial" relationship, economic losses cannot be recovered in negligence claims. Hence, in *Onita,* land purchasers could not maintain an action against vendors for alleged negligent misrepresentation in arm's length negotiations with respect to the sale of real property. The Court stated:

In the case at bar, defendants and their representative did not owe any duty to plaintiffs during the negotiations by virtue of a contractual, professional, or employment relationship or as a result of any fiduciary or similar relationship implied in the law. *Here, the relationship was adversarial.* In an arm's length negotiation, a negligent misrepresentation is not actionable. Hence, plaintiffs cannot maintain their claim for negligent misrepresentation against the defendants.

*Onita,* 843 P.2d at 899 (emphasis added).

Similarly, in *Susitna, supra,* property managers could not bring an action for damages against a bank, as property owner, based on the bank's refusal to close a property sale deal which would have resulted in plaintiff receiving $1.4 million in profit. "As alleged, [the bank's] obligations were those of the ordinary party to an arm's length business transaction. That does not give rise to a fiduciary duty." *Susitna,* 846 P.2d at 440.

The instant case provides another example of a standard adversarial relationship between two parties conducting an arm's length business transaction. For example, the complaints allege that defendant was negligent because the existing "design defects rendered the steam generators unsuitable for use in the NSSS as contemplated in the Trojan contract." (PGE complaint at ¶ 49; EWEB complaint at ¶ 55). Further, plaintiffs allege that the steam generators "suffered from serious fabrication and installation defects ... [and] Westinghouse failed to test the steam generators or the steam generator tubing in the environment in which they would be operating prior to placing them into service." (PGE complaint at ¶ 50; EWEB complaint at ¶ 56). These allegations mirror warranties expressly stated in the contract. Article V of the contract between PGE and Westinghouse provides that:

Westinghouse warrants that the equipment furnished hereunder by Westinghouse shall be free from defects in the workman-

ship and material and shall be suitable for operation as part of the NSSS sold hereunder.

The scope and division of responsibilities portion of the contract states that, "Westinghouse responsibilities include the following items and the costs incident thereto: perform the detailed engineering design (excluding layouts) of systems and equipment for the [NSSS] provided by Westinghouse, ... [and] review, for compliance with Westinghouse requirements, owner's design information and drawings; and provide technical comments on owner's design related to nuclear operation." (Section 3.0–3.3).

■ This is precisely the type of contract that is designed not to leave the scope of the expected professional services to tort standards of professional performance. *See Securities–Intermountain*, 611 P.2d at 1168. Given the terms of the written contract, plaintiffs' allegations do not invoke a professional obligation of Westinghouse which was negligently performed; they assert breaches of specific contractual commitments resulting from an adversarial, arm's length transaction. Thus, they do not plead a cause of action under negligence or negligent misrepresentation. *Id.* Defendant's motion to dismiss the claims of negligence and negligent misrepresentation will be granted.

*III. RICO claims (Counts Seven, Eight, and Nine)*

■ The Rule 12(b)(6) standard of review applicable to defendant's motions to dismiss "does not distinguish between RICO and non-RICO claims." *Rose v. Bartle*, 871 F.2d 331, 355 (3d Cir.1989).

In ruling on motions to dismiss under RICO, this Court is mindful of the Supreme Court's instruction in *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), regarding interpretation of the RICO Act.

RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, *see United States v. Turkette*, 452 U.S. 576, 586–87[, 101 S.Ct. 2524, 2530, 69 L.Ed.2d 246] (1981), but also of its express admonition that RICO is to "be liberally

construed to effectuate its remedial purposes," Pub.L. 91–452, § 904(a), 84 Stat. 947.

*Sedima*, 473 U.S. at 496, 105 S.Ct. at 3285. *See also United States v. Local 560 of International Brotherhood, etc.*, 780 F.2d 267, 295 (3d Cir.1985), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986).

*A. 18 U.S.C. § 1962(c) (Count Seven)*

■ Title 18 U.S.C. § 1962(c) provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

As recently defined by the Supreme Court in *Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), § 1962(c) requires that defendants have "some part in directing the enterprise's affairs." *Id.* at ——, 113 S.Ct. at 1170. In *Reves*, the Supreme Court affirmed the Eighth Circuit's "operation or management test" for § 1962(c) liability, holding that "[i]n sum, ... one must participate in the operation or management of the enterprise itself." *Reves*, —— U.S. at ——, 113 S.Ct. at 1173.

In the instant case, plaintiffs have alleged two separate "enterprises." The first enterprise alleged is "the Trojan project," which functioned "for the common purpose of planning, designing, constructing, licensing, and placing into commercial operation the Trojan Plant." (Plaintiffs' RICO statement at p. 92). Plaintiffs assert that Westinghouse had some part in the management or operation of this enterprise as a result of Westinghouse:

supplying major NSSS and other components for the plant, having employees assigned to the project on site, consulting on design changes and contracting to supply additional equipment and services over the years of the project, and being directly involved in the design, manufacture and installation of equipment and licensing of the plant.

(PGE complaint at ¶ 106; EWEB complaint at ¶ 112).

The second enterprise which Westinghouse is alleged to have been a part of is "the nuclear suppliers," which functioned "for the purpose of obtaining money and property by participating in the design and construction of, and the supplying of materials, equipment and services, to various nuclear facilities worldwide...." (PGE complaint at ¶ 107; EWEB complaint at ¶ 113). The nuclear suppliers enterprise is alleged to be made up of "Westinghouse, its divisions, subsidiaries, officers, employees, affiliates, individuals and other entities, including International Nickel Co. with whom Westinghouse contracted to supply goods and services to nuclear power plant owners throughout the world...." (PGE complaint at ¶ 107; EWEB complaint at ¶ 113).

■ In *Brittingham v. Mobile Corp.*, 943 F.2d 297 (3d Cir.1991), the Third Circuit held that "the 'person' charged with violation of § 1962(c) must be distinct from the 'enterprise.'" *Brittingham*, 943 F.2d at 300. The *Brittingham* Court reaffirmed the Third Circuit's holding in *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349 (3d Cir.1987), where the Third Circuit noted:

> Section 1962(c) was intended to govern only those instances in which an "innocent" or "passive" corporation is victimized by the RICO's "persons," and either drained of its own money or used as a passive tool to extract money from third parties.

*Brittingham*, 943 F.2d at 300 (*quoting Petro–Tech*, 834 F.2d at 1359). "[A] § 1962(c) enterprise must be more than an association of individuals or entities conducting the normal affairs of a defendant corporation." *Id.* 943 F.2d at 301. It is not enough to allege "enterprises that are merely combinations of individuals or entities affiliated with a defendant corporation." *Id.*

■ Plaintiffs have sufficiently pleaded their § 1962 claims under both the *Reves* and *Brittingham* rules. Turning first to the *Reves* rule, plaintiffs have alleged that the defendant had some supervisory or directory role in the Trojan project enterprise and that defendant, at least in part, operated the nuclear suppliers enterprise. As such, plain-

tiffs' allegations satisfy the *Reves* "operation or management" requirement. As to the *Brittingham* rule, plaintiffs have alleged that the Trojan project consisted not only of defendant but also "PGE and other entities and individuals, including Becktell Power Corp., PGE's architect-engineer for the Trojan Plant." (PGE complaint at ¶ 106; EWEB complaint at ¶ 112). The nuclear suppliers enterprise is alleged to include not only the defendant and its affiliates, but also "other entities, including International Nickel Co., with whom Westinghouse contracted to supply goods and services...." (PGE complaint at ¶ 106; EWEB complaint at ¶ 113). As such, plaintiffs have properly pleaded their § 1962 claims under the *Brittingham* rule. Therefore, dismissal at this early point in the litigation is inappropriate.

### B. 18 U.S.C. § 1962(b) (Count Eight)

Title 18 U.S.C. § 1962(b) of RICO declares it unlawful for:

> any person through a pattern of racketeering activity or through collection of unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Defendant asserts that the complaints fail to allege (1) the necessary acquisition of "interest or control," and (2) the necessary "nexus."

#### 1. Interest or control

Plaintiffs allege that:

> Westinghouse acquired and maintained an interest in and/or control of the Trojan project enterprise by entering into a contract to supply steam generators, and other NSSS equipment and services, and continued and expanded that interest and/or control throughout the project by receiving payments under the original contract, by contracting for additional work at the Trojan project and receiving payment on that added work, and by advancing its own commercial standing as a supplier of such systems. It acquired and maintained an interest and/or control of the nuclear sup-

pliers enterprise by contracting with International Nickel as a supplier of material for the fabrication of the Inconel 600 Tubing for use in the development of nuclear steam generators.

(PGE complaint at ¶ 114; EWEB complaint at ¶ 120).

■ In *Moffatt Enterprises, Inc. v. Borden, Inc.*, 763 F.Supp. 143 (W.D.Pa.1990), Judge Cohill found that "the 'interest' contemplated in ... § 1962(b) is in the nature of a proprietary one, such as the acquisition of stock, and that the 'control' contemplated is in the nature of the control one gains through the acquisition of sufficient stock to affect the composition of a board of directors." *Id.* at 147. This Court finds Judge Cohill's analysis persuasive and adopts it for purposes of the instant motions. Although it is self-evident that defendant acquired and maintained such an interest as to the nuclear suppliers enterprise (made up primarily of the defendant and its affiliates), the same is not true as to the Trojan project enterprise.

■ The fact that Westinghouse entered into a contract to supply steam generators and other equipment, that it received payments under the original contract, that it received payments for additional work and advanced its own commercial standing as a supplier of such systems, even if true, does not satisfy the interest or control requirement of § 1962(b). Plaintiffs' reliance on *Cincinnati Gas and Electric Co. v. General Electric Co.*, 656 F.Supp. 49 (S.D.Ohio 1986), for a contrary holding is unavailing. In *Cincinnati Gas*, the interest and control requirements of § 1962(b) were satisfied in part by the fact that the defendant in that case had obtained a mechanics lien on the project-property. *Id.* at 84. In the instant case, plaintiffs have not pleaded any similar interest or control acquired by the defendant.

Therefore, plaintiffs' § 1962(b) claim as to the Trojan project enterprise will be dismissed.

### 2. Nexus

■ Under § 1962(b), a plaintiff must allege a specific nexus between control of a named enterprise and the alleged racketeering activity. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1411 (3d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). In this case, plaintiffs have alleged such a nexus. (*See* PGE complaint at ¶ 114; EWEB complaint at ¶ 120). Therefore, defendant's motions to dismiss the nuclear suppliers enterprise § 1962(b) claim will be denied.[2]

### IV. Remaining claims

This Court will not dismiss any of the claims at this early stage in the litigation based upon a statute of limitations defense. Plaintiffs in this case have pled conduct on the part of Westinghouse sufficient to invoke the doctrine of equitable estoppel which would toll the statute of limitations. Any question of equitable estoppel against Westinghouse's assertion of the statute of limitations is one of fact which cannot be decided at this stage of the proceedings.

Further, defendant's motions to dismiss the breach of warranty cause of action (Count One) will also be denied. Plaintiffs have sufficiently pleaded the question of the failure of essential purpose under the Uniform Commercial Code.[3] *See, e.g., Young v. Hessel Tractor and Equipment Co.*, 99 Or. App. 262, 782 P.2d 164, 167–68 (1989), *rev. denied*, 309 Or. 522, 789 P.2d 1387 (1990). *Cf. Hart Engineering Co. v. FMC Corp.*, 593 F.Supp. 1471 (D.R.I.1984) (only after the Court considered extensive evidence and documents did the Court find against plaintiff in the claim of failure of essential purpose).

Defendant moves to dismiss the breach of contract by failure to deliver conforming goods claims (Count Two), asserting (1) that there is no 40–year guarantee, and (2) the 40–year warranty would be subject to the

---

2. Similarly, plaintiffs have sufficiently pleaded a RICO injury under § 1962(b). In addition, based upon the discussion *supra*, this Court finds that plaintiffs have sufficiently pleaded the Oregon RICO claim (Count Nine) and that claim will not be dismissed.

3. Having so found, no legal conclusions need be made regarding plaintiffs' equitable estoppel contention vis-a-vis this claim.

time limitations in the equipment warranty. However, plaintiffs have pleaded that there was and is such a 40–year warranty, and, therefore, there remains the question whether the limited equipment warranty is the exclusive source of any enforceable representations about the goods to be delivered under the contract, as alleged by defendant. This Court cannot rule, at this stage in the litigation, that the defendant's position is the correct one as a matter of law. Further, for the reasons discussed above, defendant's motions to dismiss this claim based upon any application of the time limitations will be denied.

■■■■ Defendant's motions to dismiss the breach of duty of good faith and fair dealing (Count Three) will also be denied. Under Oregon law, "every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance or enforcement." *United States National Bank of Oregon v. Boge*, 311 Or. 550, 814 P.2d 1082, 1086–87 (1991) (*quoting* Oregon Statutes 71.203). Under this law, "[a] party may violate its duty of good faith without also breaching the express provisions of the contract." *McKenzie v. Pacific Health and Life Insurance Co.*, 118 Or.App. 377, 847 P.2d 879, 881 (1993). Westinghouse argues that plaintiffs must allege a "special relationship," that is, discretion on the part of Westinghouse in the performance of the contract, in order to maintain a claim of breach of duty of good faith and fair dealing. However, "so long as it is not inconsistent with the express terms of the contract, the duty of good faith is a contractual term that is implied by law into every contract, not just those that necessitate the exercise of discretion." *McKenzie*, 847 P.2d at 881 (*citing Sheets v. Knight*, 308 Or. 220, 779 P.2d 1000 (1989)). In *Tolbert v. First National Bank*, 312 Or. 485, 823 P.2d 965 (1991), the Oregon Supreme Court explained that the "common law 'objective' good faith standard" is applicable in cases where plaintiffs allege bad faith in the exercise of discretion. *Id.* at 969 n. 6. The objective question in such a case is one of "observance of reasonable commercial standards." *Chaney v. Shell Oil Co.*, 111 Or.App. 556, 827 P.2d 196, 203, *rev. denied*, 313 Or. 299, 832 P.2d 455 (1992). However, in other cases, such as the instant one, the question is a "subjective" one, that is, "honesty in fact." *Tolbert*, 823 P.2d at 970 n. 6; *Chaney*, 827 P.2d at 203.

■■■■ Plaintiffs have sufficiently pleaded the breach of good faith and fair dealing claim. Plaintiffs allege that "Westinghouse knew at the time the parties entered into the Trojan contract that Westinghouse had no reasonable basis which to represent that the Trojan steam generators were capable of operating effectively for their 40–year design life...." (PGE complaint at ¶ 45(a); EWEB complaint at ¶ 51(a)). Further, plaintiffs allege that "Westinghouse withheld and continues to withhold [accurate information] from the Trojan entities, and intentionally or recklessly made false, misleading or inaccurate statements about possible defects in the steam generators...." (PGE complaint at ¶ 45(b); EWEB complaint at ¶ 51(b)). These allegations provide a basis for a breach of the subjective "honesty in fact" standard, and are perfectly consistent with the contract at issue in this case. Therefore, the motions to dismiss this claim will be denied.[4]

■■■■ Finally, defendant's motion to dismiss the fraud claim (Count Five) alleged by EWEB will also be denied. EWEB alleges that it negotiated with PGE to become a part-owner of the Trojan Plant and that EWEB relied on the facts and representations made by Westinghouse to PGE, and, in turn, relayed the EWEB by PGE, in deciding to become a part-owner. (EWEB complaint at ¶ 7–12). EWEB specifically alleges that it relied on Westinghouse's fraudulent representation that the tubing for the steam generators would last 40 years, despite the fact that Westinghouse knew this to be false.

---

**4.** It is worth noting that plaintiffs have also pleaded a "special relationship" between Westinghouse and the plaintiffs, claiming that the duty of good faith and fair dealing arises out of the "contractual relationship with PGE and the Trojan entities, its superior technical capabilities and expertise and its inducement of the Trojan entities' reliance thereon.... Westinghouse further owed PGE and the Trojan entities a special duty of candor arising out of an obligation to perform technical engineering and other services in connection with the Trojan contract." (PGE complaint at ¶ 44; EWEB complaint at ¶ 50).

*Id.* at 26–27. EWEB points out that Westinghouse knew that PGE was involved in negotiations for partners in the Trojan project, as reflected in the Trojan contract which defines "owner" to mean PGE and:

> If and when other utilities join owner in the ownership and/or participation in the output of the Trojan nuclear plant, such other utilities shall, for purposes of the contract be considered to be owner.

(Trojan contract, Art. I(a)).

However, Westinghouse argues for application of a strict rule which precludes a fraud claim if the information is not directly communicated to the plaintiff, as in the instant case. This is not the law in Oregon. In *Menefee v. Blitz*, 181 Or. 100, 179 P.2d 550 (1947), the Court held that since there was no evidence that the information had ever been communicated to the plaintiff by anyone, evidence of that information, as transmitted to a third party, was inadmissible. Again, in *Rickli v. Autzen*, 270 Or. 1, 526 P.2d 547 (1974), the Court would not allow the fraud claim to proceed where plaintiff had failed to allege that defendant knew that the misinformation would be relayed to the plaintiff. However, in *Carpenter v. Egli*, 272 Or. 337, 536 P.2d 1236 (1975), the Court held that the case was properly submitted to the jury where there was evidence that defendant, the seller of real property, had knowingly given his realtor false information about the size of the lot because the jury could find that he intended that this information would be passed on to prospective buyers such as the plaintiffs. The Court noted that it was not necessary under the circumstances to choose among various formulations, discussed in prior cases, of the applicable rule. *Carpenter*, 536 P.2d at 1237. *See also Handy v. Beck*, 282 Or. 653, 581 P.2d 68 (1978).[5] In the instant case, EWEB has pleaded that the alleged misinformation was relayed to it and that Westinghouse knew that it would be. Therefore, this case presents a scenario duplicative of *Carpenter* and for the reasons set forth in *Carpenter*, entirely distinguishable from *Menefee* and *Rickli*. *See also American National Bank of Denver v. Tonkin*, 286 Or. 73, 592 P.2d 1008, 1013–14 (1979) (distinguishing between *Menefee* and *Carpenter*, the Court found that there was evidence that the defendant intended the information to be relayed to the plaintiff). Therefore, the motion to dismiss EWEB's fraud claim will be denied.

An appropriate Order will be issued.

### ORDER

AND NOW, this 24th day of June, 1993, upon consideration Defendant's Motion to Dismiss Counts One through Four and Six through Nine of Plaintiff's Complaint (document No. 12) filed at Civil Action No. 93–225 on April 8, 1993, and upon consideration of Defendant's Motion to Dismiss Plaintiffs' Complaint (document No. 14) filed at Civil Action No. 93–562 on April 14, 1993, and upon further consideration of Plaintiffs' Response thereto, and for the reasons set forth in this Court's Memorandum Opinion filed herewith,

IT IS HEREBY ORDERED that said Motions are GRANTED in part and DENIED in part, to wit:

1. Said Motions are GRANTED in that Count Four and Count Six of plaintiffs' complaints are DISMISSED;

2. Said Motions are GRANTED in that Count Eight of plaintiffs' complaints are DISMISSED in part, to wit: the § 1962(b) claims as to the Trojan project enterprise are DISMISSED; and

3. Said Motions are DENIED in all other respects.

---

5. The general rule is "that a person cannot complain of false representations, for the purpose of maintaining an action of deceit, unless the representations were either made directly to him, with the intention that they should be acted upon by him, or made to another person with the intention that they should be communicated to him and acted upon by him." *Menefee v. Blitz*, 181 Or. 100, 179 P.2d 550, 560 (1947).