Jerry **HARPER**, Josephine Meadows, J.D. Powell, Lamar Andrews, and Addie Williams, Plaintiffs,

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY,** Defendant.

**No. CV 192–134.**

United States District Court, S.D. Georgia, Augusta Division.

July 7, 1999.

John C. Bell, Jr., Pamela S. James, Bell & James, Augusta, GA, John B. Long, Thomas William Tucker, Dye, Tucker, Everitt, Long & Brewton, PC, Augsuta, GA, Arthur R. Miller, Professor, Cambridge, MA, Melvyn I. Weiss, Michael Champlin Spencer, Ralph M. Stone, Milberg Weiss Bershad Hynes & Lerach, New York City, Richard Henry Weiss, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, James J. Binns, Philadelphia, PA, William A. Pannell, P.C., Alpharetta, GA, for Plaintiffs.

Ted H. Clarkson, Wyckliffe A. Knox, Jr., Kilpatrick Stockton, LLP, Augusta, GA, William N. Withrow, Jr., Susan S. Lanigan, C. LeeAnn McCurry, Troutman Sanders LLP, Atlanta, GA, Harry J. Winograd, Bodker, Ramsey & Andrews, Atlanta, GA, James R. Wyrsch, Keith E. Drill, Cheryl A. Pilate, Ronald D. Lee, Wyrsch, Atwell, Mirakian, Lee & Hobbs, P.C., Kansas City, MO, Julie E. Grimaldi, Kansas City, MO, Percy J. Blount, Glover & Blount, PC, Augusta, GA, for Defendant.

## ORDER

BOWEN, Chief Judge.

In the above-captioned case, Defendant American Telephone and Telegraph Company (AT & T) has filed a Motion for Summary Judgment. For the reasons stated below, Defendant's Motion for Summary Judgment is **GRANTED.**

## I. Background

Plaintiffs[1] filed this case on June 24, 1992, individually and on behalf of a class of all other persons similarly situated, alleging that AT & T knowingly participated in an enterprise operated in interstate commerce by which people would dial 900 numbers to obtain credit cards. With these 900–number programs, the caller was charged a fee for the 900–number call and would later receive an application for a secured credit card[2] in return for the charge.

Plaintiffs' Complaint alleges that this activity constitutes racketeering activity in violation of the federal RICO statute, 18 U.S.C. §§ 1961 to 1968 (1994), and that this activity violates the Communications Act of 1934, 47 U.S.C. §§ 201 to 229 (1994), and the federal common law of communications law.[3] The Complaint further alleges that Defendant committed mail and wire fraud, in violation of 18 U.S.C. §§ 1341 & 1343 (1994), in furtherance of its RICO enterprise.[4]

Plaintiffs originally presented this case as a class action, and I certified a master class and a Georgia subclass. Defendant appealed the class certification to the Eleventh Circuit Court of Appeals. The Court of Appeals decertified the class and remanded the case to this Court for further proceedings. *Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1022 (11th Cir. 1996). Defendant has filed a Motion for Summary Judgment on all of Plaintiffs' claims.

Plaintiffs' claims concern 900–number credit card programs which utilized direct mail and television advertisements to encourage participants to pay for 900–number calls. Plaintiffs contend that the solicitations for the 900 numbers promised callers a credit card in return for their phone calls.

Pay-per-call, or "900–number," telephone service was developed in the early 1980s. It was first used for telephone polling and other interactive programs designed to disseminate a wide variety of information to customers, who were usually charged for the calls in their monthly phone bills. After its inception, the 900–number industry rapidly expanded to encompass varied news, sports, sex, weather, and entertainment information programs, as well as promotional and giveaway contests. While the specifics of different 900–number programs vary greatly, their basic operation is the same: callers are enticed by television commercials, direct mail solicitation, or other advertising materials to call a 900 number, for which the callers are

1. Plaintiffs Addie Williams and Josephine Meadows have not filed a claim against Defendant AT & T. Plaintiff J.D. Powell failed to appear at his deposition and the class certification hearing, and Plaintiffs' counsel agreed to dismiss his claims against Defendant AT & T. Accordingly, Defendant's Motion for Summary Judgment against Plaintiffs Williams, Meadows, and Powell is **GRANTED.**

2. A secured credit card requires the cardholder to pay in advance any money comprising a part of the line of credit.

3. Plaintiffs have not provided a detailed discussion of their claims under the Communications Act of 1934, 47 U.S.C. §§ 201 to 229 and the federal common law of communications law. Given the quantity of documents filed in this case, it is difficult to determine Plaintiffs' specific contentions regarding these claims. Further, these claims were not aired during oral argument. Therefore, I assume that Plaintiffs have abandoned these claims. If this is an incorrect assumption, Plaintiffs are instructed to file a succinct statement of these claims with the Court within twenty (20) days of the entry of this Order. If Plaintiffs resubmit these claims, Defendant is entitled to file a motion in response. Local Rules governing page limits will be strictly enforced, and the submitted documents must be limited to these narrow issues. Accordingly, Defendant's Motion for Summary Judgment on these claims is **WITHHELD.**

4. Plaintiffs' Complaint originally presented theft by taking and deception claims filed pursuant to Georgia RICO law. In Plaintiffs' Outline of Claims against Defendant AT & T, Plaintiffs do not list any claims for theft by taking or deception. Accordingly, Plaintiffs are deemed to have abandoned these claims.

charged either a flat fee per call or a per-minute rate.

The entity which actually develops or sponsors the 900–number program, produces the solicitation materials, and develops the audio message consumers hear is an Information Provider (IP). Plaintiffs' claims involve programs developed by two IPs, BBC Interests (BBC) and American Marketing (American).

These IPs developed programs utilizing 900 numbers which were answered with recorded messages. The entity responsible for delivery of these recorded messages is a service bureau. BBC employed Info–Line Technology as its service bureau, and American employed CMI as its service bureau.

The 900–number programs also utilize call transport services. Call transport services involve the transmission of the recorded message by an interexchange carrier to the person making the telephone call, such as a long distance or a local exchange carrier. Defendant AT & T is a major long distance carrier that provided phone service to various sponsors of 900–number promotions and, after deregulation of the industry in 1986, offered billing and collection services to 900–number sponsors. The sponsors, some of which hired independent service bureaus to operate the 900–number enterprises, received a share of the fees collected by the long distance carriers from customers who called the 900 numbers.

AT & T provided call transport services for the 900 numbers at issue in this lawsuit. AT & T contends that it only provided call transport services for the IPs and service bureaus and that it had no involvement in the other areas of 900–number operations. Plaintiffs contend, however, that AT & T approved solicitation materials and scripts for telephone messages.

The price AT & T charged for interexchange transport services was set by a tariff filed with the Federal Communications Commission. AT & T contends that it provided service to the 900–number programs as it would any other customer and that it did not have the discretion to decline the transport service. Plaintiffs contend, however, that AT & T was allowed to decline the 900–number businesses at issue in this case because these programs were illegal.

Those involved in these 900–number programs earned substantial revenues through the billing and collection of charges incurred for the calls to the 900 numbers. Pursuant to a contractual arrangement, AT & T provided billing and collection services for the 900 numbers at issue in this case. This contract required the service bureau and/or IPs to adhere to AT & T's 900–number program guidelines. Specifically, Plaintiffs allege that all materials associated with the 900–number program (revisions or changes to the program, solicitation materials, or scripts) were submitted to AT & T for its review prior to use. AT & T contends that this review only ensured that the programs complied with all federal and state laws and AT & T's own internal guidelines. AT & T contends that this review was not conducted in an attempt to operate or manage programs or increase the profitability of the parties involved. AT & T attorneys were involved in this review process, and AT & T eventually began requiring IPs to provide their own attorney opinion letters concerning the legality of the 900–number programs.

Plaintiffs contend that AT & T was aware that the 900 numbers violated the law and still chose to provide services. They argue that it was the risk of getting caught that motivated AT & T's decision as to whether they would run a program in a particular area.

Although AT & T charged a fee for its services, it contends that the actual billing and collection services were tied only to the use of its services as determined in the contract. AT & T contends that the profitability of the programs and the revenues it collected did not impact its fee; the

service bureau and/or IP had to pay for AT & T's billing and collection services regardless of whether the charges were collected from the callers. The service bureaus and the IPs did not directly pay AT & T. Instead, AT & T deducted its charges and passed on what, if any, was left to the service bureaus and IPs.

Plaintiffs also contend that AT & T was actively involved with the other functions of the 900–number credit card programs. In response, AT & T contends that it did not create, formulate, or implement the programs at issue. AT & T also contends that it did not create the content of advertising or designate the means of advertising for the 900 numbers. Plaintiffs contend, however, that AT & T required its own approval of the content and means of advertising as a condition of AT & T collecting and billing for the programs.

This case focuses on 900–number programs involving credit card offers. These programs earned millions of dollars for the program operators. In these programs, the IP developed direct mail and/or television advertisements urging recipients to call a 900 number to receive a credit card. The caller was charged a flat fee for the call and later received an application for a secured credit card in return for the charge.

Each Plaintiff's particular claim and the circumstances surrounding his participation in the 900–number program is summarized below.

### A. Andrews

Plaintiff Lamar Andrews contends that he made a phone call to the Creditinfo 900 number on April 24, 1991. American serviced this program for CMI. Plaintiff Andrews made this call in response to a solicitation he received in the mail. The Creditinfo program enticed participants to dial a 900 number and incur a $50.00 charge to receive an application for a secured credit card. The solicitation also notified participants that they may have won a $5,000.00 line of credit that they could claim by either mailing the solicitation card or calling the 900 number.

Defendant contends that Plaintiff Andrews cannot identify any false statement in the solicitation on which he relied. Defendant also alleges that Plaintiff Andrews admitted that he did not read the full text of the credit card solicitation corresponding to the 900 number he called. Defendant further contends that Plaintiff Andrews did not make the payments on the 900–number charge forming the basis of this action. Plaintiff Andrews contends, however, that his telephone was disconnected for his failure to pay the 900–number charges and that he received threats from collection agencies demanding payment.

### B. Harper

Plaintiff Jerry Harper contends that his wife made a telephone call to the Financial 900 number on January 8, 1992. BBC Interests serviced this program for Info–Line Tech. Plaintiff Harper contends that his wife made this 900–number call after his daughter-in-law viewed a television advertisement promising callers a credit card in return for their phone call to a 900 number. Defendant contends that Plaintiff Harper has not offered any admissible evidence that the phone call was made in response to any fraudulent misrepresentation presented in the television advertisement.

### C. Summary of Discussion

Defendant contends that (1) Plaintiffs cannot demonstrate the predicate act of mail or wire fraud necessary to support their RICO claims because the evidence does not establish that Plaintiffs reasonably relied upon a false representation; (2) Defendant did not participate in a RICO enterprise; and (3) Plaintiffs have not suffered a compensable RICO injury. These arguments are discussed in detail below.

## II. Requirements for Summary Judgment

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Applicable substantive law determines which facts are material, that is, which facts have the potential to affect the outcome of the trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his [or her] favor." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for its motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the nature of the movant's initial burden "varies depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). If the *movant* bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, ... no reasonable jury could find for the non-moving party." *Four Parcels,* 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry its initial burden either by negating an essential element of the non-movant's case or by demonstrating that there is an absence of evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Ad-*

*ickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Merely stating that the non-movant cannot meet its burden at trial is insufficient. *Id.*

If—and only if—the movant carries this initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* at 608.[5] Again, this burden varies depending upon whether the movant or non-movant bears the burden of proof at trial. If the movant has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence sufficient to withstand a motion for directed verdict at trial. *Fitzpatrick,* 2 F.3d at 1116 (citation omitted). If the non-movant bears the burden of proof at trial, the non-movant's response must be tailored to the method by which the movant carried its initial burden. If the movant presented evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Id.* If the movant demonstrated an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant, or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* (citation omitted).

The clerk has given the non-moving party notice of the summary judgment motion, of the right to file affidavits or other materials in opposition, and of the consequences of default. Therefore, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822 (11th Cir.1985), are satisfied.

---

5. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross,* 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Rule 56 of the Federal Rules of Civil Procedure.

The time for filing materials in opposition has expired, and the motion is ripe for consideration.

## III. RICO Liability

Plaintiffs contend that the 900–number credit card programs violated federal racketeering laws. Specifically, Plaintiffs contend that Defendant committed wire and mail fraud in violation of 18 U.S.C. § 1962. Section 1962 provides:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....

> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

*Id.* This statute is commonly referred to as RICO.

In order to prevail on their RICO claims, Plaintiffs must prove, *inter alia,* (1) that there was a RICO enterprise; (2) that the enterprise's activities affected interstate or foreign commerce; (3) that Defendant was employed by or associated with the enterprise; (4) that Defendant participated, either directly or indirectly, in the conduct of the enterprise's affairs; and (5) that Defendant participated in mail or wire fraud. *See* 18 U.S.C. § 1962(c); *United States v. Starrett,* 55 F.3d 1525, 1541 (11th Cir.1995); *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank,* 755 F.2d 239, 248 (2d Cir.1985).

Defendant has moved for summary judgment on Plaintiffs' federal RICO claims. Defendant contends that Plaintiffs cannot prevail on these claims as a matter of law because they cannot establish several of the elements necessary for civil RICO liability. Specifically, Defendant argues that Plaintiffs cannot prove the existence of a RICO enterprise and, even assuming the existence of such an enterprise, Plaintiffs cannot show that Defendant participated in the conduct of the enterprise's affairs within the meaning of 18 U.S.C. § 1962(c). Furthermore, Defendant claims that Plaintiffs cannot show a legally compensable RICO injury because Plaintiffs either received refunds or did not pay the charges billed for calling the 900 numbers. Defendant also raises the voluntary payment doctrine and argues that Plaintiffs are not entitled to refunds for 900–number charges they voluntary paid.

### 1. *Existence of a RICO Enterprise*

 Under 18 U.S.C. § 1961(4), a RICO " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." In *United States v. Turkette,* the Supreme Court emphasized that a RICO enterprise "is an entity separate and apart from the pattern of activity in which it engages," and that the existence of the enterprise is a separate ele-

ment that must be proved in any RICO case. 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). While Plaintiffs must show the existence of an enterprise which is distinct from the series of predicate acts alleged in this case, they may rely on the same evidence to show both the commission of the predicate acts and the existence of the enterprise. *Id.* at 583, 101 S.Ct. 2524; *see also United States v. Cagnina,* 697 F.2d 915, 921 (11th Cir.1983); *United States v. Mazzei,* 700 F.2d 85, 87–90 (2d Cir.1983); *United States v. Bagnariol,* 665 F.2d 877, 890–91 (9th Cir.1981). Furthermore, although Plaintiffs must present "evidence of an ongoing organization, formal or informal, and . . . evidence that the various associates function[ed] as a continuing unit," *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524, they need not show that the enterprise had an ascertainable structure, *Cagnina,* 697 F.2d at 921, and the enterprise's existence may be proven by circumstantial evidence. *United States v. Elliott,* 571 F.2d 880, 898 (5th Cir.1978).

The enterprise alleged in this case is the association of Defendant AT & T and others to conduct the 900–number credit card programs. There is ample evidence in the record that these programs were conducted by an ongoing organization and that the associates of this organization conducted the program on a continuing basis until the program ceased operation. Thus, there is at least a genuine issue of fact with respect to the existence of this enterprise. In short, Plaintiffs appear to have alleged a sufficient RICO enterprise, and they have come forward with sufficient evidence to raise a genuine issue of fact concerning its existence.

### 2. *Participation in the Conduct of the Enterprise's Affairs*

To impose RICO liability under 18 U.S.C. § 1962(c), Plaintiffs must show that Defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity or collection of un-

lawful debt." As the Eleventh Circuit has stated, § 1962(c) does not punish a defendant simply for engaging in racketeering activity or for collecting an unlawful debt; rather, it punishes its "participation in the affairs of an enterprise through those means." *United States v. Pepe,* 747 F.2d 632, 661 n. 48 (11th Cir.1984). Defendant contends that Plaintiffs cannot satisfy this element of their RICO claims.

■ Defendant claims that Plaintiffs cannot show the requisite level of participation in the affairs of the enterprise. In *Reves v. Ernst & Young,* 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court held "that 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' . . . one must participate in the operation or management of the enterprise itself." Although "*some* part in directing the enterprise's affairs is required," *id.* at 179, 113 S.Ct. 1163, the Eleventh Circuit has stated that a RICO defendant "may be liable under the [*Reves* ] operation or management test by 'knowingly implementing decisions, as well as by making them.' " *Starrett,* 55 F.3d at 1548 (quoting *United States v. Oreto,* 37 F.3d 739, 750 (1st Cir. 1994)); *see also Portland General Elec. Co. v. Westinghouse Elec. Corp.,* 842 F.Supp. 161, 167 (W.D.Pa.1993) (holding that *Reves* rule was satisfied when plaintiff alleged that defendant had "some supervisory or directory role" and when "defendant, at least in part, operated the suppliers enterprise").

Defendant argues that it had no part in the operation or management of the credit card programs because it simply provided telecommunication, billing, and collection services. Defendant analogizes these activities to professional services, which have been held insufficient by themselves to satisfy *Reves. See, e.g., University of Md. v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539 (3d Cir.1993); *Wiselman v. Oppenheimer & Co.,* 835 F.Supp. 1398, 1404 (M.D.Fla.1993).

Specifically, Defendant contends that it played no role in the discretionary matters involved in creating, developing, implementing, operating, managing, or monitoring any of the 900–number programs at issue. Defendant denies that it participated in the creation or revision of the solicitation materials or scripts and claims that it never provided assistance with price setting.

AT & T provided billing and collection services for the 900–number programs pursuant to an agreement that required AT & T's approval on any advertising material associated with the programs. Defendant AT & T contends that this approval was not required as an attempt to operate or manage programs but was necessary to ensure that the programs complied with all federal and state laws.

However, Plaintiffs contend that AT & T's participation in the 900–number enterprise extended beyond the provision of these services. For example, Plaintiffs contend that Defendant AT & T participated in the 900–number credit card enterprise in the following manner:

(1) AT & T played an active role in the creation, formulation and implementation of 900–number credit card programs;

(2) AT & T knew that these programs were violating state and federal laws;

(3) AT & T provided billing and collection services for the IPs;

(4) AT & T fended off regulators by allowing the IPs to switch phone numbers and run credit card programs identical to those about which regulators complained;

(5) AT & T continued providing billing and collection services to the 900–number programs in some regions even after the Bell companies in other regions stopped ground-level billing and collections for those numbers because the programs were deceptive;

(6) AT & T quieted irate customers by providing individual refunds while keeping the remaining millions generated by the credit card programs that AT & T itself found deceptive; and

(7) AT & T required that the credit card solicitations be pre-approved by them as a condition of AT & T billing and collecting for the programs.

(Plaintiffs' Brief in Response to Motion for Summary Judgment of AT & T Corp. at 39–40) (citations omitted).

Plaintiffs' evidence could conceivably support a finding that Defendant had a role in directing the affairs of the 900–number credit card programs. Thus, there is a genuine issue of fact concerning whether Defendant participated in the operation or management of the 900–number credit card programs within the meaning of *Reves*. Thus, Defendant is not entitled to summary judgment on these grounds.

### 3. *Compensable RICO Injury*

■ Defendant argues that Plaintiffs do not have the requisite standing to sue under RICO because they either did not pay or received refunds for the charges billed to them for calling the 900–number credit card programs. The Supreme Court has stated that a RICO plaintiff "only has standing if, and can only recover to the extent that ... he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Thus, Defendant contends, Plaintiffs cannot show a compensable RICO injury and summary judgment should be granted in Defendant's favor on Plaintiffs' RICO claims.

■ This issue, however, has already been resolved by the Eleventh Circuit Court of Appeals. In the appeal of the class certification issue in this case, the court of appeals held that:

The named plaintiffs contend that the district court properly concluded that

they have standing, and we agree. At a minimum, the plaintiffs were allegedly induced by misleading solicitations to make 900–number calls, and they were the targets of appellants' illegal debts. Andrews's phone service was disconnected in part for his failure to pay 900–number charges, and the record suggests that the named plaintiffs paid at least some of the 900–number charges on their phone bills. This evidence supports the district court's conclusion that Andrews and the other named plaintiffs have standing to assert their claims. *Andrews v. American Tel. & Tel. Co.,* 95 F.3d 1014, 1022 (11th Cir.1996). Accordingly, Plaintiffs have demonstrated that they have the proper standing necessary to sue under RICO.

### 4. *Georgia Law Defenses*

Further, Defendant argues that it is entitled to summary judgment on Plaintiffs' RICO claims because Georgia law precludes the recovery of payments which were voluntarily made. O.C.G.A. § 13–1–13 provides:

> Payments of claims made through ignorance of the law or where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered unless made under an urgent and immediate necessity therefor or to release person or property from detention or to prevent an immediate seizure of person or property. Filing a protest at the time of payment does not change the rule prescribed in this Code section.

Defendant contends that to the extent that Plaintiffs paid their 900–number bills voluntarily, they are unable to recover under RICO.

The Georgia voluntary payment doctrine will be used to determine whether Plaintiffs suffered a compensable injury under RICO law only if this defense is consistent with federal policy. As the Supreme Court has held, "[a]lthough a state statute cannot be considered inconsistent with federal law merely because the statute causes the plaintiff to lose the litigation, federal courts must be ever vigilant to insure that application of state law poses no significant threat to any identifiable federal policy or interest." *Burks v. Lasker,* 441 U.S. 471, 479, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979) (citations and quotations omitted).

> Plaintiffs base their claim on a federal statute, and therefore, the issue of standing is a federal question. This fact, however, does not render state law irrelevant, .... Unless state law on the issue of ... plaintiffs' claims is inconsistent with the federal policy underlying RICO, it should not be displaced simply because plaintiffs base their claim on a federal statute.

*In re Sunrise Sec. Litig.,* 916 F.2d 874, 879 (3d Cir.1990).

■ Applying this Georgia defense to Plaintiffs' claims alleging that Defendant was involved in wire or mail fraud would severely limit the ability of the federal law to redress violations of its provisions. In considering the similar common law defense, in pari delicto, several courts have held that it is not applicable in federal RICO cases. *Schwartz v. The Upper Deck Co.,* 956 F.Supp. 1552, 1557 (S.D.Cal.1997) (stating that "[f]ederal courts which have addressed the issue have held that the in pari delicto defense is not available in RICO cases"); *see also Roma Constr. Co. v. aRusso,* 96 F.3d 566, 570 (1st Cir.1996) (holding that "we are not aware of any cases anywhere that adopt [an innocent party requirement under RICO]" and refusing to reach the issue based upon the plaintiff's innocence under state criminal statutes); *Bontkowski v. First Nat'l Bank of Cicero,* 998 F.2d 459 (7th Cir.1993) (reasoning that defendant bank could not use in pari delicto defense against a plaintiff convicted of bank fraud in conjunction with transaction that was the subject of the plaintiff's civil RICO action); *In Re Nat'l Mortgage Equity Corp. Mortgage Pool,*

636 F.Supp. 1138, 1156 (C.D.Cal.1986) (refusing to apply in pari delicto defense in RICO antitrust action based upon strong public policy in favor of competition). Accordingly, Defendant's attempt to use the voluntary payment doctrine as a defense against Plaintiffs' RICO claims is unavailing.

### 5. *Predicate Acts*

Finally, Defendant argues that it is entitled to summary judgment on Plaintiffs' RICO claims because Defendant did not commit the necessary predicate act, mail or wire fraud. Defendant's contention that Plaintiffs have failed to prove the necessary predicate act to impose RICO liability is analyzed in detail below.

### IV. Plaintiffs' Mail and Wire Fraud Claims

Plaintiffs' mail and wire fraud claims are based upon allegations that the credit card offers create the impression that a caller will automatically receive a credit card in exchange for the 900–number call. Instead, callers to the 900 numbers received an application for a secured credit card. Plaintiffs contend that they would not have made the 900–number calls if they knew that they would receive an application for a credit card rather than the credit card itself. Further, Plaintiffs contend that applications for secured credit cards are readily available at no charge from banks that regularly issue such cards. Defendant contends, however, that Plaintiffs' mail and wire fraud claims should be dismissed because Plaintiffs have failed to provide sufficient evidence that they reasonably relied on any fraudulent representation contained in the credit card solicitations.

■ "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mail or wires in furtherance of that scheme." *Pelletier v. Zweifel,* 921 F.2d 1465, 1497 (11th Cir. 1991). Defendant's actions are measured using the reasonable person standard. In other words, the court must determine if the alleged misrepresentations were "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.*

Plaintiffs must also demonstrate that Defendant had the requisite mens rea. Mens rea is defined as "a conscious, knowing intent to defraud" and requires anticipation on the part of the perpetrator that its actions will induce reliance on the fraudulent misrepresentation. *Id.* at 1499. Further, because Plaintiffs allege that Defendant's mail and wire fraud is a predicate act pursuant to RICO, Plaintiffs must also demonstrate that Defendant's alleged fraud caused them to suffer an injury and that Defendant's fraud proximately caused those injuries. *Id.*

### A. Reliance

Plaintiffs contend that reliance on the allegedly deceptive nature of the credit card offers can be inferred or presumed because they called the credit card 900 numbers in response to solicitations they either received through the mail or on television. Because Plaintiffs would not have known of the 900 numbers without relying on the solicitations, they contend that reliance on the credit card solicitations is established. Plaintiffs contend that this "but for" causation is sufficient to support a finding of the reliance necessary to support their mail and wire fraud claims. However, as the Eleventh Circuit Court of Appeals has held:

> Even if it could be shown that the appellants were engaged in a scheme to defraud and made misrepresentations to further that scheme, the plaintiffs would still have to show, on an individual basis, that they relied on the misrepresentations, suffered injury as a result, and incurred a demonstrable amount of damages.

*Andrews v. American Tel. & Tel. Co.,* 95 F.3d 1014, 1025 (11th Cir.1996).

Plaintiffs also assert the "fraud on the market theory" commonly used in securities fraud actions under the Securities Exchange Act of 1934, § 10(b) and Securities and Exchange Commission Rule 10b–5. Under this theory, a defendant's failure to disclose material facts a reasonable investor might have considered important in making an investment decision will give rise to liability even without a plaintiff's positive proof of reliance. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). The Eleventh Circuit Court of Appeals has interpreted this decision as creating a rebuttal presumption of reliance. In nondisclosure securities cases, therefore, a plaintiff may prove reliance through a *rebuttable* presumption that he relied on the undisclosed information subject to the defendant proving that the plaintiff's decision would have been unaffected even if the omitted information had been disclosed. *Lipton v. Documation, Inc.,* 734 F.2d 740 (11th Cir.1984).

Although Plaintiffs have provided no case law or argument addressing why this fraud on the market theory should be applied in their mail and wire fraud case, it is unnecessary to reach this issue. Defendant has provided sufficient evidence rebutting any inference of Plaintiffs' reasonable reliance.

Even if Plaintiffs were able to establish reliance, they must still demonstrate that their reliance on the alleged misrepresentation was reasonable. In determining whether a plaintiff's reliance on an alleged misrepresentation is reasonable, it is also relevant whether plaintiff was "reasonably able to discover the true facts for himself." *Anderson v. Golden,* 569 F.Supp. 122 (S.D.Ga.1982). The Eleventh Circuit has held that a scheme to defraud is *not* present when "a reasonable juror would have to conclude that the representation is about something which the customer should, and could, easily confirm-if they wished to do so-from readily available ex-

ternal sources." *United States v. Brown,* 79 F.3d 1550, 1559 (11th Cir.1996).

"In most cases, the question of justifiable reliance is a jury question, but where a representation is controverted by the express terms of a contract, a plaintiff will be unable, as a matter of law to establish that his reliance is justifiable." *Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.,* 133 F.3d 1405, 1410 (11th Cir.1998). "If the plaintiff would have followed the same course of conduct even with full and honest disclosure, then the defendant's action (or lack thereof) cannot be said to have caused plaintiff's loss." *Shores v. Sklar,* 647 F.2d 462, 468 (5th Cir.1981) (holding that plaintiff who failed to read or otherwise rely on circular allegedly containing misrepresentations could not recover).

Each Plaintiff's contentions regarding his reliance on Defendant's alleged misrepresentations and whether such reliance was reasonable are analyzed below.

### 1. Andrews

█ Plaintiff Andrews contends that he made a phone call to the Creditinfo 900 number on April 24, 1991. American serviced this program for CMI. Plaintiff Andrews made this call in response to a solicitation he received in the mail. The Creditinfo program enticed participants to dial a 900 number and incur a $50.00 charge to receive an application for a secured credit card. The solicitation also notified participants that they may have won a $5,000.00 line of credit that they could claim by either mailing the solicitation card or by calling the 900 number.

Defendant contends that Plaintiff Andrews cannot identify any false statement on which he relied. Defendant argues that Plaintiff Andrews failed to read the entire credit card solicitation and cannot now claim that he reasonably relied on any fraudulent misrepresentation.

[T]he decisions have held that one can not close his eyes but must show some

fraud perpetrated by the other party which actually prevented him from knowing the provisions of the contract.... [T]he law demands of everyone that he make use of his own facilities to avoid being defrauded. No other rule could safely be adopted and enforced by the courts with reference to written instruments. It is essential to all business relationships that the validity and solemnity of written contracts, freely and voluntarily executed, be upheld.... Nor in such case will a mere fraudulent statement by the opposite party or his agent as to the contents of the writing furnish a legal excuse.

*State Farm Fire & Casualty Co. v. Fordham*, 148 Ga.App. 48, 51–52, 250 S.E.2d 843 (1978). In other words, a plaintiff's failure to read must be "brought about by some misleading artifice or device perpetuated by the opposite party amounting to actual fraud such as would reasonably prevent him from reading it. Fraud which would relieve a party who can read must be fraud which prevents him from reading." *Ansley v. Forest Serv., Inc.*, 135 Ga.App. 745, 748, 218 S.E.2d 914 (1975); *see also Simpson v. Georgia State Bank*, 159 Ga.App. 310, 283 S.E.2d 278 (1981) (holding that fine print of a contract was enforceable against plaintiff who was unable to read it because of her age, cataracts, and failing eyesight); *Citizens Bank, Vienna v. Bowen*, 169 Ga.App. 896, 897, 315 S.E.2d 437 (1984) (determining that the plaintiff was not prevented from reading the documents he signed even though he alleged that the document was covered up so that he could not see all of its terms).

In support of its arguments, Defendant contends that Andrews's own testimony reveals that he did not reasonably rely on the solicitation card for the credit card offer. In his February 15, 1993, deposition, Plaintiff Andrews testified as follows:

Q: Okay. And why do you think that you placed a call to that number?

A: Because I wanted the card, a credit card.

Q: Because you say you wanted a credit card?

A: Right.

. . . . .

Q: Now, did you read anything on the card?

A: No, sir.

Q:—before calling, sir?

A: No, sir.

Q: Just so that we're not unclear on the record about this, have you ever applied for a Visa or Mastercard?

A: Before?

Q: Before.

A: No, sir.

Q: Did you think you were applying for a Visa or Mastercard when you called—

A: Yes, sir.

Q:—this number?

A: Yes, sir.

Q: What did you base that on? Why did you think you were calling? We know you didn't read anything on the card. So why is it that you thought you were applying for a credit card when you made the call?

A: Well, it advertises a Visa card, and it tells you what number to call. But when you call, you don't get nothing, no response.

Q: So you made the call because you saw the Visa emblem on the card; is that why you called?

A: Yeah, right.

(Andrews's Deposition at 237–39).

Plaintiff Andrews has failed to demonstrate the reasonable reliance necessary to support his fraud claims. By his own admission, he did not read the credit card solicitation and cannot point to any false or untrue misrepresentation on which he relied. Further, Plaintiff Andrews affirmatively states that he did not rely on any

statements made on the solicitations card in making his decision to call the 900 number. Moreover, Andrews has presented no evidence that he was prevented from reading the entire credit card solicitation. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff Andrews's mail and wire fraud claim is **GRANTED.**

*2. Harper*

 Plaintiff Harper contends that his wife made a telephone call to the Financial 900 number on January 8, 1992. BBC serviced this program for Info–Line Tech. Plaintiff Harper contends that his wife made this 900–number call after his daughter-in-law viewed a television advertisement promising callers a credit card in return for their phone call to a 900 number. Plaintiff Harper contends that his wife made the call to the 900 number after their daughter-in-law requested the call to obtain a credit card for their son. The decision to make the call was allegedly a family decision made after Harper's wife and daughter-in-law discussed the solicitation. The daughter-in-law allegedly requested her mother to make the call because she had placed a 900–number block on her own telephone.

Plaintiff Harper paid $50.00 for the 900–number call but contends that no one in his family received a credit card. Instead, the Harpers received an application for a secured credit card in return for the $50.00 charge. Plaintiff Harper contends that the solicitation promised a credit card and that sending only an application was fraudulent.

Defendant contends that Plaintiff Harper has not offered any admissible evidence that the phone call was made in response to any fraudulent misrepresentation presented in the television advertisement. In support of this contention, Defendant offers Harper's own testimony. In his February 16, 1993, deposition, Plaintiff Harper testified as follows:

Q: Were you told anything about the details of the ad?

A: No.

Q: Do you know whether it was for a secured credit card or not?

A: No.

Q: Do you know whether it was for a Visa or Mastercard?

A: I wasn't told. All I know is I was asked to—if she could make the phone call and I said I—I don't turn my wife down.

(Harper's Deposition p. 18–19). Further, Plaintiffs have offered no admissible testimony concerning what alleged misrepresentations his wife and daughter-in-law relied upon in deciding to make the 900–number call.

Plaintiff Harper has not shown the reliance necessary to establish a valid mail and wire fraud claim. It is not enough for Plaintiff Harper to demonstrate that a 900–number call was made on a telephone bill for which he was responsible. Instead, he must offer admissible evidence concerning how he or his family members were personally defrauded. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff Harper's mail and wire fraud claim is **GRANTED.**

**B. Fraudulent Representations**

Defendant contends that even if Plaintiffs are able to establish reasonable reliance on the information provided with the credit card programs, the solicitations for those programs contain no fraudulent representations. Plaintiffs, however, assert the following to support their argument that the 900–number solicitations contained fraudulent omissions:

(1) Representing to the Plaintiffs that they have been approved for a Mastercard or Visa when in fact the offer was for a secured credit card requiring a deposit in a savings or similar account in the amount of their credit limit;

(2) Representing to the Plaintiffs that they would receive a credit card

when in fact they would only receive an application for a credit card;

(3) Representing that Plaintiffs had been pre-approved for credit when in fact there was no credit preapproval;

(4) Using fictitious names of companies which incorrectly claim that they are financial institutions;

(5) Failing to disclose that the information provider soliciting calls to the 900 number had no authority to issue credit cards and that the revenue came from 900–number call charges rather than through credit card services; and

(6) Withholding the information that applications for secured credit cards are available for no charge at banks that issue them.

Because Plaintiffs are unable to establish they reasonably relied on any of Defendant's alleged misrepresentations, it is unnecessary to determine if the 900–number credit card offers contained fraudulent misrepresentations or omissions.

### V. Conclusion

Upon the foregoing, it is hereby **ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** as to all of Plaintiffs' RICO claims based upon wire and mail fraud and all claims asserted by Plaintiffs Meadow, Powell, and Williams. Defendant's Motion for Summary Judgment is **WITHHELD** as to Plaintiffs' claims filed pursuant to the Federal Communications Act and the federal common law of communications law. The Clerk is instructed to close this case if Plaintiffs do not file a motion in support of its Federal Communications Act and the federal common law of communications law claims within twenty days after entry of this Order. Each party shall bear its own costs.